**Miles F. WORTHAM, Plaintiff,**
**v.**
**DUN & BRADSTREET, INC.,**
**Defendant.**

**Civ. A. No. 75-H-453.**

United States District Court,
S. D. Texas,
Houston Division.

April 23, 1975.

Irving C. Stern, Strickland & Gordon, Houston, Tex., for plaintiff.

Robert J. King, Liddell, Sapp, Zivley & Brown, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

Plaintiff's Motion for a Preliminary Injunction is denied; the temporary restraining order of March 25, 1975, is allowed to lapse. Defendant's Motion for Summary Judgment is denied at this time.

## I. INTRODUCTION; THE STATE COURT TEMPORARY RESTRAINING ORDER

Plaintiff sued the defendant mercantile reporting agency in state court, alleging libel and malicious conduct on the part of defendant in publishing a false credit report indicating that plain-

tiff had filed for bankruptcy. *See Wortham v. Dun & Bradstreet*, Civil Action No. 1,018,679 (125th Judicial District Court, Harris County, Texas, March 17, 1975). Plaintiff sought injunctive relief and damages in the amount of $2,912,500.00. On March 20, 1975, a hearing was conducted by the state district court judge at plaintiff's request for a temporary restraining order. At the conclusion of the hearing, the judge entered an order granting the temporary restraining order in favor of plaintiff, to remain in effect until 5:00 p. m., March 24, 1975.[1] The judge also set March 24, 1975, as the date on which a hearing would be held to determine whether a preliminary injunction should be issued.

## II. REMOVAL TO FEDERAL COURT; FEDERAL COURT TEMPORARY RESTRAINING ORDER

■ Before any further action was taken in state court, defendant removed the case to this Court on March 21, 1975. Upon reviewing plaintiff's original petition, this Court has determined that removal is proper in this Court, pursuant to 28 U.S.C. § 1441(a). Had the action been filed originally in this Court, jurisdiction would have been proper under 28 U.S.C. § 1332 because plaintiff is a citizen of Texas, defendant is a citizen of Delaware and New York, by virtue of its incorporation and its principal place of business, and more than $10,000 is in controversy.

The temporary restraining order was still in effect at the time the case was removed to this Court. To permit both parties to inform the Court of their respective positions, the Court maintained the status quo by granting a similar restraining order extending the deadline date to April 1, 1975, at 5:00 p. m. *See* Temporary Restraining Order of the Court (March 25, 1975).

The Court now concludes that no preliminary injunction should issue and that the temporary restraining order should be, and it hereby is, allowed to lapse. For background purposes only, the Court herein recites certain pertinent facts now available to the Court.

## III. FACTS

Plaintiff is a real estate developer and investor who relies upon financing from various lending institutions to fund projects conducted throughout Texas. These lending institutions usually require credit information on plaintiff to supplement their data in determining whether to effect loans for him, and they often request such credit information from defendant, a well-known mercantile reporting agency which maintains offices nationwide to disseminate throughout the country credit information to subscribers via computer transmission.

An employee of the defendant, who was assigned the responsibility of assembling information from documents on file in the state and federal courts for use and inclusion by defendant in its credit reports, examined a copy of a petition in bankruptcy filed in the United States District Court for the Southern

1. The order provided in part that defendant was restrained and enjoined from doing the following:

  "(1) making any statements, whether oral or written referring to Plaintiff's credit rating, or anything about the Plaintiff's business conduct or credit references; *except for a correction report which will be circulated today, March 20, 1975.*

  (2) circulating any letters or reports to any of its customers and clients defaming the Plaintiff or misrepresenting any facts relative to the Plaintiff's credit rating, and from contacting any of Defendant's customers and clients, whether by oral or written means, to defame Plaintiff in any manner or interfere with Plaintiff's conduct of his business;

  (3) causing any publication, whether in newspaper or magazine or any other means, which contains false information with reference to Plaintiff's credit rating, or making any statements of any facts concerning Plaintiff's credit . . . ."

District of Texas, Houston Division, Bankruptcy No. 75–H–10. The employee, who was apparently new at her job, noticed the signature of plaintiff at the bottom of the petition and assumed, and so indicated in' a report prepared for defendant, that plaintiff was *personally* filing for bankruptcy. In reality, as the employee later discovered, although she did not at that time apparently understand, plaintiff was signing the petition in a representative capacity for a corporation of which he was president. *See* Affidavit of Mrs. Sharon Rector at 1 (March 26, 1975).

The report prepared by Mrs. Rector was delivered on January 8, 1975, to a "key account analyst," Frank Cooper, another employee of defendant. Mr. Cooper prepared a report to be transmitted to subscribers of defendant who had paid to receive copies of credit reports on plaintiff. The subject report, which is the basis of plaintiff's suit as reflected in the original petition filed in state court, provides as follows:

### NEW LOCATION & PETITION FILED FOR REORGANIZATION

Offices have recently moved to 4601 Montrose Blvd.

On Jan 3 1975, Miles F. Wortham filed a petition in the U.S. District Court, Houston, docket # 75–H–10 requesting a reorganization under Chapter XI of the Amended Bankruptcy Act. No schedule was filed. Attorney is Strickland and Gordon. Referee is A. L. Moller.

*See* Exhibit A, Plaintiff's Original Petition at 1 (March 17, 1975). Mr. Cooper has indicated that he believed the report to be true at the time he prepared it. *See* Affidavit of Frank Cooper at 1–2 (March 26, 1975).

The report remained in circulation from January 8, 1975, until about March 17, 1975. Plaintiff apparently became aware of the existence of the report at that time because he was contacted by two representatives of Southwestern Bell Telephone Company who were at-

tempting to determine whether plaintiff's telephone service should be disconnected because of his alleged bankrupt financial condition. Suit was filed in state court because of the dissemination of this report.

A conference was conducted by the state district judge in whose court suit was filed on March 20, 1975. At this conference, attended by plaintiff, his counsel and Robert B. Armbruster, Jr., defendant's district manager in Houston, Texas, Mr. Armbruster acknowledged preparation, publication and dissemination of the subject report, admitted its inaccuracy and agreed to issue a corrective report to all those who had been notified of the alleged bankruptcy filing. The state district judge, as noted previously, thereafter issued a temporary restraining order which required defendant to issue the corrective report and further restricted the type of information which defendant could distribute concerning plaintiff pending a full hearing on a preliminary injunction.

### IV. PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION; DEFENDANT'S MOTION TO QUASH TEMPORARY RESTRAINING ORDER

The facts now available to the Court make clear that an erroneous credit report was issued regarding plaintiff's personal financial status. Plaintiff now seeks to have this Court continue to enjoin defendant until trial from publishing any credit information about plaintiff except that information contained in the public records of a government publication. Defendant opposes the application for a preliminary injunction on federal and state constitutional grounds and on the basis of a recent decision of the Texas Supreme Court.

■■ Granting or denying a preliminary injunction rests within the discretion of this Court. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2948, at 427 (1973). The factors to be considered in determining whether pre-

liminary injunctive relief is appropriate are: (1) whether the plaintiff is likely to prevail on the merits; (2) whether the plaintiff is in danger of suffering irreparable harm; (3) whether the potential harm to the defendant from issuance of the injunction outweighs the possible harm to the plaintiff if injunctive relief is denied; (4) whether issuance of a preliminary injunction will serve the public interest. *Blackshear Residents Organization v. Romney*, 472 F.2d 1197 (5th Cir. 1973).

■ Although the United States Court of Appeals for the Fifth Circuit has assigned these factors no particular weight, the commentators suggest that the likelihood that plaintiff will suffer irreparable harm before trial on the merits is the most important prerequisite to be evaluated. 11 Wright & Miller, *supra*, 431. In this case, the Court concludes that plaintiff will not suffer irreparable harm before trial on the merits can be conducted. It is undisputed that the erroneous report was issued on January 8, 1975, and that a corrective report was issued on March 20, 1975. The erroneous entry is no longer in plaintiff's credit file as maintained by defendant. Defendant attests through its agents that all subscribers who were notified of the alleged bankruptcy petition have now been notified of the erroneous nature of that report.

Enjoining defendant from continuing to perform its lawful obligations at this stage is not merited on the record now before this Court. Dissemination of erroneous information has already occurred, a corrective report has already been issued, and erroneous information has allegedly been deleted from the file. Plaintiff is now primarily seeking monetary relief for damages allegedly already done. With an adequate alternative remedy available, the Court concludes that the irreparable harm factor does not form part of a foundation on which to base a grant of injunctive relief to this plaintiff. 11 Wright & Miller, *supra*, at 434.

Regarding factors 3 and 4, the Court concludes that the public interest would be harmed, and the possible injury to defendant would outweigh possible future injury to plaintiff if the application for injunctive relief were approved. Plaintiff's primary concern was, and is, the erroneous report. According to defendant, the report no longer exists. The injury, if any, which such a report has allegedly inflicted cannot be extrapolated to merit completely inhibiting defendant from performing legal obligations. To this extent, the "public interest" of the subscribers to defendant's service is harmed since proper, accurate information cannot be disseminated by defendant under plaintiff's requested injunction; the defendant is also injured by being prevented from disseminating accurate information about which plaintiff can have no complaint. The Court therefore concludes that no preliminary injunction should issue.

## V. THE MOTION FOR SUMMARY JUDGMENT

Defendant has also moved for summary judgment in this case. Because evaluating such a motion requires the Court to consider the merits of the case, the Court has deferred to this section a consideration of the first factor in the preliminary injunction "formula"—the likelihood of plaintiff's prevailing on the merits. That factor will be considered along with the motion.

Defendant founds its motion for summary judgment on the theory of an affirmative defense recognized under the law, which is the equivalent of a "privilege" or an "excuse" permitting it to publish this erroneous material. Defendant contends that such a privilege exists by virtue of the First Amendment to the United States Constitution, by virtue of Article I, § 8, of the Texas Constitution, Vernon's Ann.St., and by virtue of the holding of the Texas Supreme Court in *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970).

### A. Credit Reports and The Federal Constitution

██ Prior restraint on publication is generally prohibited by the First Amendment. *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). To that extent, a court should refuse to enjoin publication of defendant's reports prior to their dissemination with no allegation or showing of their inaccuracy. However, such prohibition does not elevate the defendant's credit reports to the level of constitutionally protected publications.

In *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), the United States Supreme Court upheld as constitutional an ordinance of the City of New York which forbade disseminating certain kinds of commercial information on its city streets. The Court there held that such an ordinance did not abridge First Amendment freedoms, including the freedom of communicating information and disseminating opinion, because the handbill in question constituted "purely commercial advertising".

The Supreme Court has never authoritatively defined distinctions between "commercial" speech and "political or social" speech for purposes of determining the propriety of, and extent to which, First Amendment protections are available for defendant's credit reports. However, in cases involving other news publications, the Supreme Court has made clear that for publications to enjoy First Amendment protections, such publications must perform certain functions and serve certain societal goals.

In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that an advertisement published in the *New York Times* seeking funds to aid those protesting racial discrimination in Alabama was entitled to First Amendment protection. Respondents in that case had sought to enjoin publication of the subject matter and had sought damages for publication of allegedly false matter. The Court refused to enjoin publication and denied respondents' requested damages. Litigants would not be able to recover damages from a news publication unless "actual malice" or "reckless disregard for the truth" were demonstrated as part of the conduct of the news publication in printing material which was shown to be false.

The Court went on to distinguish between the type of expression protected in *Sullivan* from that identified and not protected in *Valentine.* 376 U.S. at 265, 84 S.Ct. 710. The Court stated that publications issued for "purely commercial" reasons were not entitled to the same First Amendment protection as publications which communicated information, expressed opinion, recited grievances, protested claimed abuses and sought financial support. *Id.* Such a distinction was justified by the Court in its attempt to identify the policy underlying the strong protection afforded by the First Amendment to freedom of speech and the press: there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." 376 U.S. at 270, 84 S.Ct. at 721. This distinction, and the Court's rationale for making it, were reiterated in subsequent First Amendment cases. *Time, Inc. v. Hill,* 385 U.S. 374, 405, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (Harlan, J., concurring in part and dissenting in part); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *see* Comment, *Freedom of Expression in a Commercial Context,* 78 Harv.L.Rev. 1191 (1965).

██ This Court concludes that as a matter of federal constitutional law, defendant's credit reports are not entitled to a First Amendment privilege so as to justify protection under *New York Times v. Sullivan* or *Time, Inc. v. Hill.*[2]

---

2. Since the Memorandum and Opinion in this case was issued, the United States Supreme Court has rendered its decision in *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L. Ed.2d 600 (1975). In that case, a majority of the Court held unconstitutional a Virginia

This lack of entitlement has been specifically recognized by the United States Court of Appeals for the Fifth Circuit. *Hood v. Dun & Bradstreet, Inc.*, 486 F. 2d 25, 29–30 (5th Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1580, 39 L. Ed.2d 882 (1974). Relying upon *Valentine v. Chrestensen, supra*, and *Pittsburgh Press Co. v. Pittsburgh Com'n on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), the *Hood* Court held that the credit report being litigated in that case, which had been prepared by other officers of the instant defendant, was distributed pursuant to a written contract, whereby the report was to be maintained in strict confidence. It was distributed to an extremely limited readership for commercial purposes and clearly without regard to social concerns or grievances. The report in *Hood* referred to plaintiff only in regard to his business (Hood was a building contractor who conducted the business of constructing gasoline service stations in Atlanta) and his relationship with business associates in a commercial capacity. 486 F.2d at 30. The Court of Appeals held that such a credit report does not fall within the definition of matters of general or public interest. *Id.* Defendant's instant credit report is therefore not entitled to federal constitutional protection.

### B. Credit Reports Under Texas Law: The O'Neil Case

Texas constitutional[3] and statutory[4] law on libel regarding the

---

statute which made criminal the sale or circulation of any publication to encourage or prompt the procuring of an abortion. The publication in question was a newspaper containing an advertisement which listed information about available out-of-state abortion services.

In explaining the rationale for the holding, Mr. Justice Blackmun, writing for the majority, clarified the Court's position on *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 and went on to shift and refine the focus on the proper inquiry to be made in First Amendment cases of this nature. Stated briefly, the *Bigelow* Court emphasized that the issue of protected speech is not resolved by determining whether the words are printed in a "commercial" versus "non-commercial" context, nor intended as a solicitation for commercial enterprise. 421 U.S. at 819–21, 95 S.Ct. 2222, 44 L.Ed.2d at 610–11. Rather, the proper approach is to by-pass commercial intent and concentrate on the extent to which the controversial words contain factual material of "clear public interest". 421 U.S. 822, 95 S.Ct. 2222, 44 L.Ed.2d at 612.

In *Bigelow*, for example, the Court found the advertisement in question to be protected speech because it

"conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia."

*Id.* (95 S.Ct. at 2233, 44 L.Ed.2d at 612).

Despite the Supreme Court's restrictive reading of *Valentine v. Chrestensen* and its shifted focus in "commercial speech" cases, this Court concludes that *Bigelow v. Virginia* does not change the analysis or result in this case. The publisher of the instant credit report designs it for circulation to a strictly limited subscription audience and goes to great lengths to ensure that it does not enter the mainstream of public discussion. The report therefore continues to be not entitled to protection under the First Amendment because it contains no subject matter of interest to a diverse audience.

3. Article I, § 8, of the Texas Constitution provides in part:

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

4. The Texas Legislature has defined "libel" as follows:

"A libel is a defamation expressed in printing or writing, . . . or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, *or financial injury* . . . ." (emphasis added) Vernon's Tex.Rev.Civ.Stat.Ann. art. 5430 (1901).

In Texas, falsely stating that a person is bankrupt or has filed for bankruptcy is libel per se. *Gulf Construction Co. v. Mott*, 442 S.W.2d 778 (Tex.Civ.App.—Houston [14th Dist.] 1969, *no writ*) ; *cf. Buck v. Savage*, 323 S.W.2d 363 (Tex.Civ.App.—Houston 1959, *writ ref'd n. r. e.*)

privileged publication of credit reports converge in *Dun & Bradstreet v. O'Neil,* 456 S.W.2d 896 (Tex.1970).

The *O'Neil* facts are almost identical to the facts of the instant case, and the instant defendant was also involved in that case. In *O'Neil,* the defendant issued a "Special Notice" declaring that plaintiff had filed a voluntary petition in bankruptcy. Notice was distributed in the usual manner. In reality, plaintiff's brother (Alvin Numan O'Neil) had filed for bankruptcy, not plaintiff (Alvin Truman O'Neil). Plaintiff brought a libel action against the defendant. The district court directed a verdict for the agency, which the El Paso Court of Civil Appeals reversed. Tex.Civ.App., 448 S.W.2d 153.

On appeal, the Texas Supreme Court reversed the judgment of the court of civil appeals and affirmed the judgment of the trial court. 456 S.W.2d 896. The Court began its analysis by reciting general principles of Texas libel law applicable to the case: (1) plaintiff had been libeled as a matter of law; (2) defendant could and did rely upon a conditional privilege as a defense; (3) a credit reporting agency is entitled to a conditional privilege if certain requirements were met; and (4) once the conditional privilege is shown to exist, the burden shifts to the plaintiff to show that the privilege has been lost, 456 S.W.2d at 898, i. e., that "plaintiff must then show actual malice." *Id.*

The Court further enunciated certain principles regarding the burden which defendant had to meet in order to be entitled to the defense of conditional privilege: (1) reports of mercantile reporting agencies are privileged if furnished in good faith to one having a legitimate interest in the information; (2) such a report loses its privileged character if it is sent indiscriminately to subscribers generally, or to those not in-

quiring, concerning, or not interested in knowing, the condition and financial standing of the person reported upon; (3) insofar as there is general publication to those without an apparent, present interest, the risk of false information is one to be borne by the business. 456 S.W.2d at 898. The Court then went on to quote the dictum of an earlier case, *Bradstreet Co. v. Gill,* 72 Tex. 115, 9 S.W. 753 (1888),[5] for the proposition that when one furnishes false and injurious information regarding a person's commercial standing to those not among the "interested" class —traders and merchants, as a class— the communication is not privileged. 456 S.W.2d at 899.

The Texas Supreme Court went on to distinguish *O'Neil* from *Gill* and *Shipp* by holding that the defendant's conditional privilege was shown to exist in *O'Neil* because it had not released credit information in general or for general use. *Id.* Emphasizing the "special notice" procedures and the narrow distribution of information exercised by defendant, the Court held that the libelous statement made by defendant was conditionally privileged.

Having found a conditional privilege to exist, the Court shifted its attention to the question of actual malice: actual malice would have to be proved by plaintiff in order to overcome defendant's privilege. 456 S.W.2d at 900. To define "actual malice," the Court reverted to its recent definition, rendered in *El Paso Times, Inc. v. Trexler,* 447 S.W.2d 403 (Tex.1969). The Texas Supreme Court there defined actual malice in the same manner as the United States Supreme Court in *New York Times Co. v. Sullivan, supra*: "with knowledge it was false or with reckless disregard of whether it was false or not." 456 S.W. 2d at 900. The Texas Supreme Court went on to state: "Insofar as the definition of actual malice is concerned we do

5. The only other case to have discussed the issue prior to *O'Neil* is *R. G. Dun & Co. v. Shipp,* 60 S.W.2d 502 (Tex.Civ.App.—Texar- kana 1933), *rev'd on other grounds,* 127 Tex. 80, 91 S.W.2d 330 (1936).

not think the instant case involving a conditional privilege is distinguishable from the *New York Times* and *El Paso Times* cases which involve First Amendment Constitutional privileges". *Id.* at 900–01.

The Texas Supreme Court concluded that no fact issue existed regarding the liability of the defendant. The conditional privilege continued in force, according to the Court, because although plaintiff's evidence might establish defendant's negligence in failing to verify bankruptcy information, the evidence did not raise a fact issue regarding whether or not the defendant acted "with knowledge that it was false or with reckless disregard of whether it was false or not". 456 S.W.2d at 901.

### C.  The Law To Be Applied

#### 1.  The Conflict Between Hood and O'Neil

The Texas Supreme Court's holding in *O'Neil* establishes as a matter of Texas law a protection for the instant defendant which parallels, and is patterned after, federal First Amendment protection granted to newspaper publications under *New York Times v. Sullivan*. The United States Court of Appeals for the Fifth Circuit in *Hood* held that the federal constitution can be no source of protection for the defendant. *Hood* therefore directly contradicts the *O'Neil* result.

 Such a conflict creates a delicate constitutional problem for this Court. As an *Erie* court in this diversity case, this Court is supposed to behave as would any state court within the jurisdiction of Texas. But as the Fifth Circuit emphasized in *Hood*, federal courts are not immutably bound under *Erie* to follow state court decisions where it appears that a state court con-

sidering the identical issue would not rely on the precedent in question. The Court there went on to reverse the holding of a district court which had refused to follow a ruling of the Georgia Supreme Court rendered in 1886. 486 F.2d at 31–32.

#### 2.  Rationale of the Hood Decision

Comparing policy reasons, as the district court had done, the appellate court in *Hood* ruled that a Georgia court, deciding the issue today, would have adhered to the holding of the Georgia Supreme Court in 1886 which found no conditional privilege to exist for credit reporting agencies. *Id.* The appellate court premised its conclusion on the fact that credit reporting agencies had thrived in Georgia, even in the absence of the privilege, and that in recent years the court had noted a shift in emphasis from the protection of credit reporting agencies to the protection of an individual or business enterprise being investigated. To illustrate the growth in consumer protection, the court pointed to the enactment of the Fair Credit Reporting Act. 15 U.S.C. §§ 1681–1681t (Supp.1971).[6]

#### 3.  Interests of Credit Reporting Agencies v. Interests in Individual Privacy

The shifting trend noticed by the Court of Appeals has received scholarly and judicial attention. Comment, *Protecting the Subjects of Credit Reports,* 80 Yale L.J. 1035 (1971) ; *see generally* Annotation, *Imputation of Insolvency as Defamatory,* 49 A.L.R.3rd 163 (1973) ; Annotation, *Sufficiency of Showing of Malice or Lack of Reasonable Care to Support Credit Agency's Liability for Circulating Inaccurate Credit Report,* 40 A.L.R.3d 1049 (1971) ; Annotation, *Li-*

---

6.  The federal Fair Credit Reporting Act does place certain responsibilities upon credit reporting agencies; a subject is provided access to his report and is also provided the right to amend the report and limit its access to those who have a "legitimate business need." But the act does not apply to individuals like the instant plaintiff, about whom information is sought for the purpose of extending *commercial,* as opposed to *consumer,* credit. *See Wrigley v. Dun & Bradstreet, Inc.,* 375 F.Supp. 969 (N.D.Ga.1974), *aff'd without opinion,* 500 F.2d 1183 (5th Cir. 1974).

*bel and Slander: Report of Mercantile Agency as Privileged,* 30 A.L.R.2d 776 (1974 Supp.). This Court also takes notice of such a trend.

Determining the proper legal protection for credit reporting agencies has always sparked a controversy between two compelling interests: (1) a desire to protect the interests of merchants who use the information, taken together with the usefulness of the reports in facilitating commercial transactions; and (2) the desire of subjects of the credit reports to protect their reputations from injury resulting from dissemination of erroneous information. *See* Smith, *Conditional Privilege for Mercantile Agencies—Macintosh v. Dun,* 14 Colum.L.Rev. 187, 206 (1914). To promote deterrence of the dissemination of erroneous reports and risk spreading for injuries caused by such erroneous communications, the current trend would dictate that certain costs should be placed on such agencies as the defendant. These agencies can certainly bear the risk of false reporting more suitably than can victims such as plaintiff. Costs of bearing the risk can also be spread more readily by the agency. Since the agency exercises control over the reports, it is the only possible party which would be deterred by bearing the costs of false reporting.

Shifting the costs and risk bearing in the instant case to acknowledge current trends would require this Court to formulate and apply as a matter of law a standard less rigid and difficult to overcome than the *New York Times* "actual malice" test.

The Supreme Court has distinguished commercial speech from that speech or publication protected by the First Amendment, and by the *Hood* decision the Court of Appeals has embedded this distinction into the federal constitutional framework as regards the credit reports of the instant defendant. Further, the *O'Neil* decision has been criticized for equating protection afforded to credit reports with that afforded to newspaper publishers, and it has also been criticized for establishing such protection without measuring the impact on the "public interest". *See* Note, 49 Texas L.Rev. 198 (1970).

Yet, despite this criticism, this Court considers itself bound under *Erie* and *Hood* to follow the *O'Neil* holding. There was confusion in *Hood* as to just how modern-day Georgia courts would rule on the question there presented. No such confusion attends predicting how Texas courts would rule after *O'Neil.* The Texas Supreme Court has spoken definitively; the *O'Neil* facts are identical for all relevant purposes to those of the instant case, and the Texas Supreme Court's recent decision is not in conflict with federal constitutional law as explicated by the United States Supreme Court. Therefore, the *O'Neil* case controls.

### D. Impact of O'Neil on the Motion for Summary Judgment

On the record now before the Court as applied according to *O'Neil* standards, plaintiff is highly unlikely to prevail on the merits unless he can discharge the heavy *O'Neil* burdens placed upon him. Thus, granting a preliminary injunction to plaintiff is not justified under this last factor—likelihood of prevailing on the merits—or under any of the other three factors enumerated above. *See* ¶ IV, *supra.* The Court has previously noted, as well, that such an injunction should not apply to that information defendant maintains in plaintiff's file which is accurate.

Regarding the motion for summary judgment, the Court has insufficient facts available to it at this time to decide whether the motion can be granted. Applying the *O'Neil* formula, the Court finds that the only thing which has thus far been established is that plaintiff was falsely identified as having filed for bankruptcy. The burden has shifted to the defendant to demonstrate that it is entitled to a conditional privilege. Defendant has attempted to meet

this burden by stating, via the affidavits of several of its employees, that the subject information, as well as plaintiff's regular file and the corrective report drawn up on March 20, 1975, were disseminated in the ordinary manner, under strict confidence and with limited distribution to appropriate subscribers only. That is, under *O'Neil*, defendant has attempted to show good faith distribution to persons having a legitimate interest in the information. 456 S.W.2d at 898.

Plaintiff contests this fact and alleges that defendant has possibly disseminated the erroneous information orally to certain subscribers and possibly to others who are not and would not have been authorized to receive the information. Such an allegation raises a question of fact which cannot be resolved on the record now available. The Court is therefore unable to determine as a matter of law whether defendant has established its entitlement to the defense of conditional privilege.

The Court hereby directs defendant to submit within ten (10) days a detailed list of all subscribers who have received a copy or been otherwise notified of the erroneous information disseminated concerning plaintiff, indicating, where appropriate, whether those subscribers have been furnished with corrective reports. This list should take the form of a supplemental pleading to defendant's motion for summary judgment,[7] and the pleading should demonstrate via supporting arguments and authorities that defendant is entitled under *O'Neil* to a conditional privilege in this case. Plaintiff will respond within five (5) days thereafter, specifically addressing both the issue of entitlement and the issue of actual malice, assuming that defendant meets its burden on entitlement.

---

7. The Court recognizes that defendant has already alleged that reports concerning plaintiff were sent out in strictly controlled fashion, as is the usual custom, *see* Defendant's Memorandum of Authorities in Support of Defendant's Motion for Summary Judgment at 3 (March 26, 1975), but the Court deems full disclosure of recipients a more equitable and more efficacious method of promptly resolving this controversy.