Argued July 6, affirmed September 13, 1977

# HARLEY-DAVIDSON MOTORSPORTS, INC.,
## *Respondent,*
## *v.*
# MARKLEY et al, *Appellants.*
## (No. 412-556, SC 24788)
### 568 P2d 1359

Gary M. Bullock, Portland, filed briefs for appellants.

Bernard Jolles, of Franklin, Bennett, Ofelt & Jolles, P.C., Portland, argued the cause and filed a brief for respondent.

Before Denecke, Chief Justice, and Holman, Howell, and Lent, Justices.

HOLMAN, J.

## HOLMAN, J.

This is an action for damages for defamation. Defendants appeal from a judgment entered on a jury verdict for $500 general damages and $25,000 punitive damages.

As is proper after a verdict for plaintiff, the facts will be stated in a manner most favorable to it. Plaintiff and defendant Markley were the respective operators of two dealerships in the metropolitan part of the state for Harley-Davidson motorcycles. Defendant Didenti was a supervisory employee of Markley. The action arose out of a letter, written by Didenti and signed by him with the name of "De John," a former customer of plaintiff. The letter was written to the Harley Davidson Motor Company, purporting to complain about the services and treatment which De John had received at the hands of plaintiff. The writing of the letter was not authorized by De John, and its contents were false.

The first two assignments of error are the trial court's failure to grant defendants' motions for a nonsuit and a directed verdict. The third is the giving of an instruction allowing the jury to presume damages if a libel did, in fact, occur. A single basis for these assignments is defendants' contention that under the ruling of *Gertz v. Welch*, 418 US 323, 94 S Ct 2997, 41 L Ed2d 789 (1974), the First Amendment as applied to the states by the Fourteenth Amendment dictates that in cases of libel brought by one who is neither a public figure nor officeholder, a recovery must be based upon defendant's actual knowledge of the falsity of the statement or upon his reckless disregard for its truth or falsity,[1] unless there is proof

---

[1] The term "actual malice" is used by the Court to describe knowledge of falsity or reckless disregard of the truth. This is unfortunate and will lead to confusion because it does not mean hate, ill will or intention to harm, which is usually termed "express malice," or "common law malice" and sometimes "actual malice." "Actual malice," as used by the Supreme Court of the United States, is not malice at all.

[ 363 ]

of actual injury.[2]

■ Defendants argue there is no evidence of actual knowledge or of reckless disregard of falsity, or proof of actual injury.[3] Plaintiff claims there is. Even assuming the existence of such evidence, we must decide whether a constitutional privilege is applicable because the jury was not instructed upon any such privilege but was told that if a libel occurred, it could presume damage without proof of injury. It is therefore necessary that we determine what *Gertz* held and whether it is applicable, given the existence of such evidence or not. The instruction given by the court was in accord with the Oregon law on the subject, as set forth in *Hinkle v. Alexander,* 244 Or 267, 411 P2d 829, 417 P2d 586 (1966). We there adopted the rule as it is set forth in 3 Restatement of the Law of Torts § 569, ch 24 (1938), which is:

> " 'One who falsely, and without a privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other although no special harm or loss of reputation results therefrom.' " 244 Or at 272.

*See also Beecher v. Montgomery Ward & Co.,* 267 Or 496, 517 P2d 667 (1973).

A series of United States Supreme Court cases has developed limitations upon actions for libel for the protection of free speech and free press pursuant to the First Amendment. However, these cases have all arisen out of situations in which there were news media defendants, and either the defamation arose from activity and debate about issues of public concern or the defamation was published concerning a public official or public figure. In addition to *Gertz, supra,* the principal cases are: *Rosenbloom v. Metromedia,* 403 US 29, 91 S Ct 1811, 29 L Ed 2d 296 (1971); *Curtis*

---

[2] Under *Gertz v. Welch,* 418 US 323, 94 S Ct 2997, 41 L Ed 2d 789 (1974), the burden of proof is required to be clear and convincing, but no issue has been raised concerning this requirement.

[3] It is not entirely clear what is meant by actual injury other than that it is not synonymous with special damages.

*Publishing Co. v. Butts,* 388 US 130, 87 S Ct 1975, 18 L Ed 2d 1094 (1967); and *New York Times v. Sullivan,* 376 US 254, 84 S Ct 710, 11 L Ed 2d 686, 95 ALR 2d 1412 (1964).

In *New York Times, supra,* the Court ruled that the First Amendment precluded any recovery in defamation by a "public official" for any statement made relating to his official conduct unless the plaintiff showed that it was made with knowledge that the defamatory matter was false or with a reckless disregard of whether or not the statement was false.

In *Curtis Publishing Co., supra,* the Court expanded the *New York Times* constitutional privilege by applying it in actions brought by "public figures" as well as by public officials. Public figures include those who, because of their status or conduct, are subject to substantial public interest.

In *Rosenbloom, supra,* a badly divided Court faced a situation in which the plaintiff was neither a public figure nor a public official but was involved in an issue of some public concern. The plurality opinion, agreed to by only three members of the Court, held that the subject matter of the defamatory statement was the criterion for the application of the *New York Times* constitutional privilege. It held that the *New York Times* protection would be extended to all statements (regardless of the status of the plaintiff) concerning matters of general public interest.

The plurality opinion in *Rosenbloom* lost its authority when the Court subsequently decided *Gertz, supra.* In that case the plaintiff was a private individual in the particular context in which the defamation arose, although the statement concededly involved an issue of public interest. The Court rejected the "public interest" criterion and chose to determine the applicability of the qualified privilege established by *New York Times* on the basis of the public or private status of the plaintiff. Under this new analysis, a private plaintiff would not be forced to overcome the stringent

*New York Times* privilege in order to recover for a defamation which arose from a comment made by the news media on a matter of public concern. The Court also said, however, that the Constitution does not permit "liability without fault" on the part of a "publisher or broadcaster of defamatory falsehoods injurious to a private individual." This indicates that where the defamation by the media was of a private person, there would at least have to be evidence of simple negligence on the part of the publisher or broadcaster in determining the falsity of the defamatory material before a recovery could be had.

In the instant case there is no public official or figure as plaintiff, there is no issue of public concern, and *there is no media defendant.*[4] The crucial elements in the above cases which brought the United States Supreme Court into the field of defamation law are missing. There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. The facts of the present case are wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling.

Some courts have used the above-discussed decisions of the Supreme Court of the United States as excuses to overhaul their states' law of libel and slander. Such a case is *Jacron Sales, Inc. v. Sindorf,* 276 Md 580, 350 A2d 688 (1976),[5] which was, as is our present case, a solely private defamation action. In

---

[4]By analogy, and not on constitutional grounds, the Supreme Court of the United States has adopted the *New York Times* rule, whether or not a media defendant is involved, as applicable to libel actions arising out of labor disputes in order to avoid interference with preeminent federal labor relations law. *Linn v. United Plant Guard Workers,* 383 US 53, 86 S Ct 657, 15 L ed 2d 582 (1966).

[5]Also see *Millsaps v. Bankers Life Company,* 35 Ill App 735, 342 NE2d 329 (1976), in which the court held, without discussion, that the *Gertz* holding was applicable to a totally private defamation action.

this most peculiarly reasoned case, the court, in a not clearly discernible manner, used *Gertz's* overruling of the public interest criterion advocated by the plurality opinion in *Rosenbloom* as an explanation of why the *New York Times* constitutional privilege ought to be applied to *all* private defamation actions. Even though the overruling of *Rosenbloom* was used in *Gertz* to make a recovery by a private plaintiff against a media defendant more easily available despite a matter of public interest being involved, the holding was nonetheless used in *Jacron Sales* as a reason for limiting the ability of a private plaintiff to recover against a non-media defendant when no matter of public interest was involved.

Despite the Maryland court's use of *Gertz* in its attempt to rationalize its action, we believe *Jacron Sales* probably demonstrates that the Maryland court decided, on a non-constitutional basis, to unify and overhaul its law of defamation. Because it did not want media defendants to be in a preferred position to non-media defendants, it decided that if a privilege was granted to media defendants, it was only fair that it be granted to non-media defendants as well. It therefore granted the privilege to all defendants, even though there is no constitutional basis for it. The court said:

> "Wholly apart from any possible Supreme Court holding in the future based on constitutional grounds, we conclude as a matter of state law that the *Gertz* holding should apply to media and non-media defendants alike, and to both libel and slander. * * *.
>
> "* * * * *.
>
> "Yet another reason for applying the *Gertz* holding to non-media defendants and to slander as well as libel is the compelling need for consistency and simplicity in the law of defamation. * * *." 350 A2d at 695-96.

A somewhat similar position seems to have been taken by 3 Restatement (Second) of the Law of Torts § 580B (1977):

> "One who publishes a false and defamatory com-

munication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

"(a) knows that the statement is false and that it defames the other,

"(b) acts in reckless disregard of these matters, or

"(c) acts negligently in failing to ascertain them."

In Comment *c.* the following is found:

"* * * In *Gertz v. Robert Welch, Inc.,* (1974) 418 U.S. 323, the Supreme Court specifically held that the First Amendment to the Constitution does not permit the imposition of 'liability without fault' on 'a publisher or broadcaster of defamatory falsehood injurious to a private individual.' Aside from this restriction, the Court said, the States may define for themselves 'the appropriate standard of liability.' The strict liability of the common law has thus expressly been ruled unconstitutional. * * *."

However, in Comment *e.* it is recognized that *Gertz* granted the constitutional privilege only to news and communication media:

"* * * The defendant in the *Gertz* case was the publisher of a magazine. The Court speaks frequently of 'news media' and 'communication media' and states the rule in terms of a 'publisher or broadcaster.' The precise holding of the case, therefore, does not extend beyond a statement published by a member of the communications media; and the constitutional requirement of fault on the part of the defendant may turn out to be limited to this holding, though this seems unlikely."

The following rationale is used for application of the qualified privilege to all cases:

"But the principle of the *Gertz* decision would appear to be broad enough to cover this latter situation. As the Supreme Court declares, the protection of the First Amendment extends to freedom of speech as well as to freedom of the press, and the interests that must be balanced to obtain a proper accommodation are similar. It would seem strange to hold that the press, composed of professionals and causing much greater damage because

of the wider distribution of the communication, can constitutionally be held only for negligence, but that a private person, engaged in a casual private conversation with a single person, can be held liable at his peril if the statement turns out to be false, without any regard to his lack of fault."

Any claim that a constitutional privilege exists in this case must necessarily rest upon the premise that it is based upon free speech as distinguished from free press.

In Nimmer, *Is Freedom of the Press a Redundancy? What does it add to Freedom of Speech?*, 26 Hastings L J 639, 656 (1975), the author sees the primary function of the free press guarantee, as distinguished from free speech, as insuring the existence of a forum for wide-open dialogue. He sees free speech as serving three important functions: (1) contributing to democratic dialogue, as does the guarantee of free press; (2) allowing self-fulfillment through uninhibited self-expression; and (3) affording a safety valve for the harmless airing of grievances.

■ In the present case the interest in democratic dialogue is non-existent. The defamatory matter does not contribute to the free exchange of ideas in decision making for a self-governing society. When this interest supporting First Amendment speech is removed, the only interests left, when weighed against the states' protection of a private individual's reputation, call for a conclusion that the free speech guarantee does not require interference with the states' interest in providing redress for defamation. The Supreme Court of the United States has never indicated in this context that constitutional curtailment of state actions was necessary to protect the free speech interests.

In *Calero v. Del Chemical Corp.,* 68 Wis2d 487, 228 NW2d 737 (1975), the Wisconsin Supreme Court held that the First Amendment privilege had no application to purely private defamation. The court said:
"* * * But the 'constitutional command of the First

Amendment' is said to be the 'competing interest' requiring this rule. *Gertz,* 418 U.S. p. 349, 94 S.Ct. 2997. The rule is said to apply to 'publishers and broadcasters' and to be motivated by a concern that '. . . jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . .' *Gertz,* 418 U.S. p. 350, 94 S.Ct. p. 3012. This is clearly a First Amendment application of the rule. Neither *Times'* nor *Gertz'* protections apply to the case before us. As Justice Goldberg said, concurring in *Times,* 376 U.S. pp. 301, 302, 84 S.Ct. p. 737:

" 'Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private defamation does not abridge the freedom of public speech or any other freedom protected by the First Amendment.' " 228 NW2d at 747.

After discussing one or more of the four United States Supreme Court cases with which we are here concerned, the following courts refused a First Amendment privilege to credit reporting services: *Hood v. Dunn & Bradstreet, Inc.,* 486 F2d 25, 28 (5th Cir 1973), cert. denied, 415 US 985, 94 S Ct 1580, 39 L Ed 2d 882 (1974); *Kansas Electric Supply v. Dunn & Bradstreet, Inc.,* 448 F2d 647, 649 (10th Cir 1971); *Grove v. Dunn & Bradstreet, Inc.,* 438 F2d 433, 436 (3d Cir 1971); *Wortham v. Dunn & Bradstreet, Inc.,* 399 F Supp 633, 638 (SD Tex 1975); *Roemer v. Retail Credit Co.,* 44 Cal App 3d 926, 931, 119 Cal Rptr 82 (1975); *Retail Credit Company v. Russell,* 234 Ga 765, 218 SE2d 54, 57 (1975).

■ We are not impressed with the argument, advanced by both the Restatement (Second) and the Court of Appeals of Maryland, that because the news media is given a constitutional privilege, non-media defendants should be placed in no less a position. Because a private individual's right to recover for libel has been made more difficult in situations in which his interests have been at least partially outweighed by important constitutional values, it does not follow, for obvious reasons, that his recovery should be made more difficult in situations in which no such constitu-

tional values are involved merely for the sake of securing symmetry of treatment of defendants. It is our conclusion that *Gertz* does not require application of the constitutional privilege to actions of defamation between private parties insofar as the issues raised here are concerned.

Defendants' next assertion is that under *Gertz* it was improper to submit the issue of punitive damages to the jury. Plaintiff contends that defendants are not entitled to raise this issue because defendants did not mention in their motions for a nonsuit and a directed verdict the impropriety of submitting punitive damages to the jury, but raised only the issue generally of whether plaintiff had proved a submissible case; neither did they take exception to the instructions submitting punitive damages to the jury nor make any motion to remove consideration of such damages from it.

■ The trial judge made the following statement at the time for taking exceptions to the instructions:

"Both parties are granted an exception for failure to give instructions requested by them exactly as instructed—as requested. And further, *are granted an exception to the giving of instructions entrusted* [sic] *by the other party."* (Emphasis added.)

We must decide, therefore, whether defendants are in the same position as they would be had they taken an exception to the submission of punitive damages to the jury, despite their failure to do so. The granting of a blanket exception is something a trial judge should not do. No judge, regardless of how learned, wise, and experienced he may be, never makes a mistake. It takes only a few minutes to listen to the exceptions to see whether an oversight or a mistake has been made or whether there has been a failure to realize an unmentioned aspect concerning the instructions he has given. It is particularly important from a judicial administration standpoint that a trial judge take the time to so listen, for it is only then, if he finds he has made a mistake, that he can rectify it. If he fails to

listen and thereby misses the opportunity to rectify any mistake he may have made, the entire time of the trial is lost, to say nothing of the expense to the state and to the litigants in appealing and retrying the case.

■■ The matter is so important to efficient judicial administration that we are holding that in the future no party may rely on such an offer by a judge, and exceptions to instructions given must be taken before the propriety of such instructions will be considered on appeal. Lest defendants contend that they were lulled into a false sense of security by the court's granting of a blanket exception, we will dispose of their contention. *Gertz* also held that in an action by a private plaintiff there could be no punitive damages recovered against a media defendant in the absence of the defendant's knowledge of falsity or reckless disregard of the truth. Defendants advance no argument other than that *Gertz* is applicable; we have held, however, that in the absence of a media defendant, it is not. Defendants make no contention that aside from the authority of *Gertz,* free speech interests, other than the interest in democratic dialogue, outweigh an interest in non-compensatory damages; we therefore do not have to meet that contention.[6]

On neither issue of actual or punitive damages have defendants raised any point under the Oregon Constitution, and we therefore have not considered its application.

■ Defendant's next assignment of error involves the admission of evidence, concerning other acts of defendants, which was submitted by plaintiff for the purpose of demonstrating express malice. Plaintiff introduced evidence that the Harley Davidson Company had inadvertently sent to defendants invoices concerning the shipment to plaintiff of motorcycles which were in

---

[6] In *Calero v. Del Chemical Corp.,* 68 Wis2d 487, 228 NW2d 737 (1975), from which an excerpt has been quoted, the court did rule that punitive damages in purely private defamation cases were not affected by the *Gertz* constitutional privilege.

great demand, and which had been ordered by plaintiff. The evidence indicated that defendants had written "Cancel, Jack" across the face of the invoices and had returned them to the company instead of referring them to plaintiff. "Jack" was the first name of Mr. Frezza, the principal officer and owner of plaintiff.

Plaintiff also introduced evidence that it had sold a motorcycle to a third party who returned it after operating it 53 miles. As such, it was then a second-hand vehicle. There was evidence from which a jury could conclude that the defendant Markley learned of the transaction through the third party and that he sent his brother-in-law, who was an employee, to plaintiff to see whether he could buy the vehicle as a new one. The brother-in-law informed plaintiff that even though the motorcycle had a few miles on it, he wanted a written statement from plaintiff that it was a new vehicle because such a statement would make it easier to finance the vehicle through his credit union. After securing the statement, the brother-in-law filed a complaint against plaintiff with the Consumer Protection Division, which complaint was drawn up for him by the defendant Didenti.

The only objection to the evidence was a motion for a mistrial which was, as follows:

"At this time, Your Honor, this being the second day of trial, namely—we started yesterday afternoon—I would move for a mistrial based on the case of *Gertz v. Welch,* 418 US 323, a 1974 United States Supreme Court case. It would be my position, to this point, Mr. Jolles relied on the Coos Bay Times case to allow in evidence of all kinds of other defamatory or alleged defamatory actions to be put in evidence on proving punitive damages. It is my position, according to the *Gertz v. Welch* case, he is limited to proving the false statements and proving the maliciousness of the false statements to punitive damages but not by bringing in all the other extracuricular [sic] activities such as forged documents that have nothing to do with the pleadings of the case. Based on that, I move for a mistrial."

For several reasons defendants' assignment of error is

not well taken. First, it is not really intelligible. Second, it is not a proper way to object to the introduction of testimony. Third, if defendants are complaining that the evidence is irrelevant because the holding in *Gertz* requires a finding of actual injury or of knowing or reckless falsehood, neither of which can be shown by evidence of other transactions, we have already held that *Gertz* is not applicable. Fourth, we have two Oregon cases which hold that this type of evidence is admissible to show express malice: *Mannix v. The Portland Telegram,* 136 Or 474, 529, 284 P 837, 297 P 350, 300 P 350 (1931), and *Peck v. Coos Bay Times Pub. Co., et al,* 122 Or 408, 423, 259 P 307 (1927). We also have a case which held to the contrary, *Upton v. Hume,* 24 Or 420, 436, 33 P 810, 21 LRA 493 (1893), but this aspect of the case was overruled *sub silentio* by the two subsequent cases.

The next assignment of error is the giving of an instruction to the effect that where defendants reiterate defamatory charges by a defensive plea of truth, the jury may treat such plea, unless it finds it was made in good faith, as an aggravation of the original wrong and may take it into consideration in fixing punitive damages. Defendants contend that the instruction was improper because such plea cannot be found to be in bad faith so long as reasonable evidence is introduced to support it, and that defendants did so offer evidence to support their plea. This is another instance in which defendants took no exception to the instruction, and their standing to complain here depends upon the blanket exception granted by the trial judge. We shall consider the assignment of error nonetheless because, otherwise, defendants could contend they they would have taken the exception had the trial judge not granted them the blanket exception.

The current rule in Oregon is laid down by *Upton v. Hume, supra,* as follows:

"If under the color of justification, the defendant seeks to reiterate and perpetuate his slander, it may be considered by the jury as evidence of malice, and in

[ 374 ]

aggravation of damages; but where the plea is made in good faith, and all that can be said is that he failed to fully support it by competent proof, we do not see the justice of applying a rule to him not applicable to the other litigants who happen to fail in a bona fide defense." 24 Or at 437.

This was a change from the case of *Shartle v. Hutchinson,* 3 Or 337 (1871), which allowed aggravation of damages as a result of mere failure to carry the burden of proving the truth of the plea without the necessity of any finding that the plea was made in bad faith. In conformance with the rule of *Upton* are Harper and James, The Law of Torts 418, § 5.20 (1956); McCormick on Damages 436-37, § 119 (1935); 2 Sedgwick on Damages 866-68, § 447 (9th ed 1912); and 1 Seelman, THE LAW OF LIBEL AND SLANDER IN THE STATE OF NEW YORK 469-70, § 352 (1964).

However, Prosser, The Law of Torts 799, § 116 (4th ed 1971) states the rule as follows:

"The modern cases, however, have tended quite properly to recognize that the defendant is entitled to present an honest defense without being penalized, and have limited such aggravation to cases where it appears that the defense was entered in bad faith, *without evidence to support it."* (Emphasis added.)

It is apparent that Prosser's rule, as set forth, does not specifically say that if there is some evidence to support the plea, the plea may not be used to enhance the damages, although the rule might be so construed. On behalf of their contention that the instruction should have so told the jury, defendants point to the Oregon Uniform Jury Instruction 1 Damages (Oregon State Bar C.L.E. (1973)) § 31.34, which states, in part:

"You are instructed that where a defendant reiterates defamatory charges in his answer by alleging truth of the original publication, and thereafter offers no evidence to prove their truth, * * *."

This instruction, apparently in conformance with defendants' contention, probably arose from the Bar Committee's interpretation of Prosser. The distinction

between a good faith plea of truth, which was the basis of the instruction given in this case, and a plea of truth offered with evidence to support it has been glossed over by caselaw and by a majority of commentators who do not meet the distinction head on. It is our conclusion that the ultimate issue is the good faith of the plea, and that the language, "without evidence to support it [the plea of truth]," in Prosser's statement is merely an illustration of a bad faith use of the plea and is not essential to the instruction.

Seelman, *supra,* recommends the complete abolition of the practice which allows the plea of truth ever to be considered in aggravation of damages in a case of libel. The author questions why a defendant should be compelled to show that he had entered a plea of truth in good faith and states that, at the very least, where a defendant has offered any evidence in support of his plea, it should not be considered as an aggravation of damages. There is much to be said for the author's contention that the instruction should not be used at all,[7] a contention which defendants have not made. However, if such a plea is to be considered as an aggravation of damages, the logical criterion should be good faith, and not whether a defendant introduces evidence to support the plea.

Defendants cite *Snyder v. Fatherly,* 153 Va 762, 151 SE 149 (1930), on behalf of their position. However, the actual case holding is that it was error to give an instruction that if the plea of truth was not sustained, the jury could consider the plea in aggravation. Therefore, the holding is consistent with the instruction about which defendants complain and throws no light one way or the other upon the present question. Admittedly, the language used, aside from the holding, is favorable to defendants' position. Defendants

---

[7]The commentators have noted that the consideration of an unproven plea of truth in aggravation of libel damages is inconsistent with the absolute privilege of parties participating in legal proceedings. Harper and James, The Law of Torts § 5.20 (1956); McCormick on Damages § 119 (1935).

also cite *Las Vegas Sun v. Franklin,* 74 Nev 282, 329 P2d 867, 874 (1958), which has the identical holding as that of *Snyder v. Fatherly, supra.* Despite the language of these cases, as distinguished from their holdings, we believe the better criterion is a simple one of lack of good faith without any qualification concerning evidence offered by defendant.

■ Lastly defendants contend error was committed in the denial of a mistrial because of the following occurrence during closing argument:

"MR. JOLLES [plaintiff's counsel]: . . . he had a man here of his own to look at those signatures, and that man was told by Mr. Didenti that he did not sign that cancelled check [sic]—

"MR. BULLOCK [defendants' counsel]: I'm going to object. This isn't evidence, this is argument. There is no evidence relating to this. I move for a mistrial at this time.

"THE COURT: I will deny your motion.

"MR. JOLLES: You heard the evidence. They had their own man look at it and he didn't show up to testify. Now, that said volumes.

"\* \* \* \* \*.

"Now, you have heard that instruction, and what that means here is Mr. Didenti gets up and said, 'I didn't write cancel Jack.' But they don't call an expert, a handwriting expert to tell you that he didn't write it, even though an expert was in the courtroom during the recess and examined the samples. Now, what does that say about Mr. Didenti writing, 'cancel Jack' on there?"

A handwriting analyst called by plaintiff had testified as to her conclusion that defendant Didenti had written the notation on invoices instructing the factory to cancel deliveries to plaintiff. Didenti denied that he had done so. On cross-examination Didenti had been questioned over objection, as follows:

"Q. Now, during the course of this trial after you heard Mrs. Lehman [the handwriting expert] testify, did you attempt to check with other handwriting experts just to see whether or not that handwriting was yours?

"A. No, I didn't, Sir.

"Q. Did anybody on your behalf?

"MR. BULLOCK: Your Honor, I have a matter I would like to take up with the Court.

"THE COURT: All right."

(In chambers)

"MR. BULLOCK: Your Honor, I'm going to object to this question. Number one, he wants to know if I had anyone check and that's privileged."

(Back in Court)

"MR. JOLLES: Just answer this question yes or no, Mr. Didenti; was a handwriting expert engaged to check on those exhibits, and was he here last night?

"A. I don't know if he was a handwriting expert or not.

"Q. And that individual is, as far as you know, is he going to testify here today?

"A. I do not know, Sir.

"Q. Did that individual ask you or did you tell him whether or not you had signed a—wrote those words, 'Cancel Jack' on there?

"A. I told him no, Sir. He asked but I told him no."

Defendants argue that the ruling of the court was erroneous and prejudicial since there was no testimony that an expert in handwriting was brought to the courtroom by defendants to view the signatures. The evidence is capable of the inference that a person was in court to check on the signatures, that Didenti told him he did not write "Cancel, Jack," and that the person was not called by defendants as a witness. It would be unusual to have someone check on the signatures who is not a handwriting expert. It is our opinion that the argument was legitimate.

The judgment of the trial court is affirmed.