HOUSTON CHRONICLE PUB. CO. v.
BOWEN.    (No. 6998.)

(Court of Civil Appeals of Texas.    Galveston.
Nov. 9, 1915.    Rehearing Denied
Dec. 2, 1915.)

1. APPEAL AND ERROR ⬥⟳742 — ASSIGNMENT
OF ERROR—STATEMENT OF OBJECTION.

An assignment of error in the admission of
evidence cannot be considered, where the state-
ment following it does not show what objection
was made to the evidence.

[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 3000; Dec. Dig. ⬥⟳742.]

2. LIBEL AND SLANDER ⬥⟳103—ACTION—EVI-
DENCE.

In an action for libelous publication, in-
cluding what took place in plaintiff's room, the
officers arrested him on suspicion that he might
be guilty of a murder committed in another
state, undertaking to describe with great par-
ticularity what happened at that time, it was
permissible for plaintiff to show the untruth of
the publication by testimony as to the actual
occurrences when he was arrested.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. § 281; Dec. Dig. ⬥⟳103.]

3. APPEAL AND ERROR ⬥⟳742—ASSIGNMENTS
OF ERROR—SUFFICIENCY OF STATEMENT.

In an action for libel, an assignment of er-
ror in permitting plaintiff and another witness
to testify that plaintiff had not been taken before
a magistrate after his arrest was not supported
by a statement that plaintiff, on direct examina-
tion as to whether the officer read any warrant
to him when he was arrested, answered that
they did not have any warrant.

[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 3000; Dec. Dig. ⬥⟳742.]

4. LIBEL AND SLANDER ⬥⟳7 — ACTIONABLE
WORDS—CHARGE OF CRIME.

A publication in a daily newspaper of large
circulation that plaintiff, who had come from At-
lanta, Ga., had acted so peculiarly as to attract
the attention of detectives, and had been arrest-
ed and imprisoned without a warrant upon a
mere unfounded suspicion that he was guilty of
the murder of a girl who had been killed in
Atlanta, and for whose murderer a reward had
been offered, and of the finding of a girl's blood-
stained clothing hanging from the window sill of
the room occupied by plaintiff, with a personal
description of plaintiff and a publication of his
picture and that of the murdered girl in the
same issue, was libelous per se.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. §§ 17-78; Dec. Dig. ⬥⟳7.]

5. LIBEL AND SLANDER ⬥⟳55 — ACTIONABLE
LIBEL—DAMAGES.

The publication and circulation of matter
libelous per se as to the plaintiff entitled him
to actual damages, even though a part of the
publication was privileged.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. § 333; Dec. Dig. ⬥⟳55.]

6. LIBEL AND SLANDER ⬥⟳5 — MALICE —
DAMAGES.

Plaintiff, libeled by the publication of an ar-
ticle libelous per se, was entitled to recover ac-
tual damages, and was not required to prove
malice except as a basis for the recovery of ex-
emplary damages.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. § 278; Dec. Dig. ⬥⟳5.]

7. TRIAL ⬥⟳194—INSTRUCTIONS—WEIGHT OF
EVIDENCE.

In an action for libel, defendant's requested
charge that, the plaintiff having failed to show
by a preponderance of the evidence that defend-

ant in publishing the article was actuated by
express malice, defendant was not liable, was
properly refused, as being on the weight of the
evidence, in that it assumed that plaintiff had
failed to prove malice by a preponderance of the
evidence.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 413, 436, 439-441, 446-454, 456-466;
Dec. Dig. ⬥⟳194.]

8. LIBEL AND SLANDER ⬥⟳4—"MALICE."

"Malice," in an action for libel, means an
act done with a bad or wicked intent and the
specific intention to injure, or an act done with
such wanton or gross indifference as to indicate
an utter disregard of consequences.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. § 111; Dec. Dig. ⬥⟳4.

For other definitions, see Words and Phrases,
First and Second Series, Malice.]

9. TRIAL ⬥⟳260 — INSTRUCTION — REQUESTS
—DAMAGES.

In an action for libel, defendant's requested
charge on the issue of exemplary damages was
properly refused, where the court's main charge
thereon was sufficiently full and fair to protect
the defendant in all its rights.

[Ed. Note.—For other cases, see Trial, Cent.
Dig. §§ 651-659; Dec. Dig. ⬥⟳260.]

10. LIBEL AND SLANDER ⬥⟳42—PRIVILEGE—
JUDICIAL OR ADMINISTRATIVE PROCEEDINGS.

The publication of plaintiff's unwarranted
arrest and imprisonment by police officers on a
mere suspicion of his connection with a murder
then being investigated in another state was not,
in the absence of malice, privileged as a publica-
tion of a proceeding in the administration of law,
where the entries on the police blotter showing
the time of arrest, plaintiff's name, occupation,
and residence, that he was being held and that
he was released, was not shown to be required
by any ordinance or shown to have been made in
a proceeding in the administration of the law;
and, even if that were so, nothing contained in
the entries justified the publication that plain-
tiff had been arrested and imprisoned for the
murder by a certain named person.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. §§ 127-129; Dec. Dig. ⬥⟳
42.]

11. LIBEL AND SLANDER ⬥⟳5—"MALICE"—
WHAT CONSTITUTES.

In an action of libel, it is not necessary that
malice be shown by proof of ill will, animosity,
or hatred, or by willful or wanton act of gross
indifference or an act done with the specific in-
tent to injure the person injured; but it may
be inferred from the fact that the publication
was made with such utter recklessness as to in-
dicate a disregard of the consequences.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. § 278; Dec. Dig. ⬥⟳5.]

12. LIBEL AND SLANDER ⬥⟳112 — ACTION —
SUFFICIENCY OF EVIDENCE OF MALICE.

Evidence, in an action for libel in publishing
plaintiff's unwarranted arrest and imprisonment
on the mere suspicion of his connection with a
murder committed in another state, held suffi-
cient to show actual malice, justifying an award
of exemplary damages.

[Ed. Note.—For other cases, see Libel and
Slander, Cent. Dig. §§ 325-341; Dec. Dig. ⬥⟳
112.]

Appeal from District Court, Harris Coun-
ty; J. W. Woods, Special Judge.

Action by Paul P. Bowen against the Hous-
ton Chronicle Publishing Company. Judg-
ment for plaintiff, and defendant appeals.
Affirmed.

⬥⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Hunt, Myer & Teagle, of Houston, for appellant. W. W. Kirkpatrick, G. W. Tharp, and W. J. Johnson, all of Houston, for appellee.

McMEANS, J. Paul P. Bowen brought this suit against the Houston Chronicle Publishing Company, a corporation, Marcelus E. Foster, Charles B. Gillespie, George E. Kepple, Leon J. Van Laeys, and Robert A. Higgins, for the recovery of $20,000 as actual and $10,000 exemplary damages, growing out of a publication in the Houston Chronicle, a daily newspaper published in the city of Houston, in its issue of May 6, 1913, of an alleged libelous and defamatory article of and concerning him. Plaintiff dismissed as to all the defendants except the Houston Chronicle Publishing Company. A trial before a jury resulted in a verdict and judgment for the plaintiff for $2,000 as actual and $1,000 as exemplary damages, from which the defendant has appealed.

The article in question is as follows:

"Phagan Murder Suspect Held in Houston.

"Youth From Atlanta Is Placed in Jail by the · Police of This City.

"His Moans and Weeping at Hotel St. Jean Result in His Arrest.

"Mary Phagan, 14-Year Old Girl Who Was Killed.

"[Then follows a picture of Mary Phagan.]

" 'Why Did I Do It?' Weeps Youth in His Room.

"Arrested He Denies He Ever Knew Girl.

"Paul P. Bowen, a bookkeeper and stenographer from Atlanta, Ga., is being detained by police authorities here in connection with the murder of 14-year old Mary Phagan of that city. Bowen was arrested last night by Chief of Police Davison, Chief of Detectives Peyton and Detective Hilton at 1520 Texas avenue, at the corner of Crawford street.

" 'A night of terror,' as officers term it, led to the detention of Bowen. Sunday night in room 214 at the St. Jean Hotel, Main street and Prairie avenue, the young man paced the floor and moaned. Persons in adjoining rooms were unable to sleep and reported to the management that something was wrong in the room. An investigation discovered Bowen poring over letters and newspaper accounts of the murder and crying aloud.

" 'Oh, why, why did I do it,' he is said to have cried. 'I would not have done it—I ought not to have done that—if I had it to go over I wouldn't do it,' were repeatedly heard by those who listened and who frequently walked through the hall in an effort to get some cause for the peculiar actions of the man.

"Shadowed All Day Monday.

"Monday the young man was shadowed and the matter was reported to the detective department. About 5 o'clock he registered off and moved to Texas avenue and Crawford street. There he engaged a room for a week. Last night, shortly after midnight, the officers went to the place and talked with him.

"Bowen answered a knock at his room door and then straightened himself and looked directly at the officers. 'Who are you fellows, and what do you want here?' he asked.

"The officers answered that they wanted to talk to him, and he then invited them into his room. He kept a distance from them, however,

and held in his right hand an open knife. Bowen appeared nervous throughout a conversation of perhaps 15 minutes, but replied to all queries promptly and to the point.

"When one of them told him to 'consider yourself under arrest,' he coolly answered, 'That's all right, but you've got the wrong man.' He closed his knife and handed it to an officer as he sat on the side of the bed. To one officer he pointed out his trunk and grip.

"Officers opened the trunk and started ransacking it. They lifted out clothes—some good ones that indicated a well-dressed man—and then piled letters, post cards and pictures on the floor.

" 'If I had a gun you would never go (at this point the article is continued on page 13 under the headlines: " 'Why Did I Do It?' Weeps Youth in Room. Arrested He Denies He Ever Knew Girl," as follows:) through that trunk,' said Bowen. 'The things in there are mine and not yours—I don't know anything about this affair and you'll have to show me strong.'

"Officers talked to him for more than an hour at the police station, but Bowen stoutly denied any knowledge of the killing of the young girl. He continued to show nervousness, however, and frequently inquired of the detectives why he was being questioned in such a manner.

" 'If I had had the least suspicion that this would happen to me, I wouldn't have been in Houston long—I would have left here Sunday night,' he is attributed as saying.

"No information could be obtained stronger than of a circumstantial nature, such as led to his being taken into custody. He was placed in cell No. 2 upstairs and across the hall from the chief detectives' office. He slept but little and did not undress to lie down. Tuesday morning he was at the cell door early.

"Complains of Being Tired.

"Bowen complained of being hungry. He declared, too, that he was tired—almost worn out. He walked the floor nervously, then sat down on the side of his cot. He next stepped to the grating and inquired if he was going to be 'allowed to starve to death,' or would he be given some breakfast.

"About 9 o'clock he was taken into a private office with Chief of Detectives Peyton and Detectives Andrew and Shelly. He admitted that he had lived in Atlanta and had come from that city to Houston. But that he ever knew Mary Phagan he stoutly denied. He snapped his answers to the officers.

"When shown the pictures found in his trunk and grip he pointed out a number of persons, including several young ladies. He declared though that none of them are 'Mary Phagan or any of her kinfolk.' He told the officers again and again that he had never heard of the girl, but admitted that he knew the place where she had worked.

"The newspaper clippings, all of them accounts of the murder, Bowen failed to explain. He was shown them and portions of them were read to him. He admitted that he is familiar with the story of the crime through reading the papers, and said his interest is simply because Atlanta is his home.

"Bowen came to Houston Sunday night, presumably from New Orleans, although this has not been determined, as the prisoner declined to talk about his arrival as freely as he did other matters. He went directly to the St. Jean Hotel and asked for a room.

" 'What kind of a room do you want?' was asked him. 'I want a dollar room,' he replied.

" 'Sorry, sir, but we haven't got anything less than a dollar fifty," the clerk answered.

"Bowen turned and walked to the door with his grip in hand. The clerk called him, but he did not heed it and started out. The clerk ran to the door and explained that he had just dis-

covered a dollar room vacant. The young man returned and registered.

"On the book he wrote, 'Paul P. Bowen, Atlanta, Ga.,' in a bold hand. There was no effort to conceal his identity or the city from which he came. The clerk assigned him to room 214 and ordered his grip sent to it. He turned to the guest then and inquired:

" 'Atlanta, eh?'

" 'Yes, Atlanta,' was the only reply.

"The young man went to his room and a few minutes later went out for supper. He had registered at 7:45 o'clock. Before 9 o'clock he was in his room.

### "Read Letters and Weeps.

"He did not retire at that hour, though. Opening his grip, it developed, Bowen read and re-read some letters. Most of these were from young ladies. He wept and then threw aside the missives.

"Picking from among the contents of the grip a number of newspaper clippings he pored over them as if eager to get every word of every sentence. Then he moaned aloud: 'Oh, if I hadn't done that! Why did I do it! What did I do it for!'

"Mrs. A. Blanchette of Texas City occupied an adjoining room. She was unable to sleep or even rest. The young man, she told officers, alarmed her and she feared something serious was the matter. She finally advised the night clerk at the hotel and he investigated.

"Mrs. Blanchette and the clerk heard the young man moaning, both told detectives. They decided, however, that it was best not to disturb him.

"Bowen continued his actions and talked to himself complaining of being lonesome. He begged to himself for company. He moaned and paced the floor and sobbed aloud. The clerk peered into the room and saw the letters, pictures and pieces of newspapers were scattered about him.

### "The Hotel Clerk Determined to Watch the Young Man.

"Bertillion Expert Jones of the police department has apartments at the St. Jean Hotel and to him the clerk confided the story. It was then the detectives were advised and began to watch him.

"About 5 o'clock Monday Bowen, who had been in and out of the hotel all day, walked to the desk and announced that he would 'register off.' He sent to room 214 for his grip. In the meantime his trunk was still at the railroad station.

"Attachés of the hotel lost trace of the young man when he first left the hotel, but, thinking that something was wrong, decided to locate him again. They found that he did not leave the city. His baggage—a trunk—was discovered at the station and traced to 1520 Texas avenue, a rooming and boarding house.

"Bowen engaged his room late in the evening, and then went uptown. He returned to his room late. A few minutes before midnight the police decided to interview him. The three men —Chiefs Davison and Peyton and Detective Hilton—went to the house, where he was taken into custody.

### "Man Is About 22 Years Old.

"Bowen is about 22 years of age and has light hair. He is well dressed and well educated. He has been a bookkeeper and stenographer and claimed that he worked in Atlanta, Ga., for the Morrow Transfer Company. He gave his home address as 108 Ivy street.

"He has worked in several places in Georgia, Alabama, Louisiana and Texas. He claimed that it is his first visit to Houston. He declined to tell the police anything about his rela-

tions or any of his business connections, except as given above.

"Bowen is slight of build, perhaps 5 feet 6 or 7 inches in height. He weighs about 125 pounds and appears brisk and energetic. He admitted to officers that he had lived in Atlanta many years, nearly all his life. He denied, however, that he knows anything about the National Pencil Factory, Leo Frank, the manager, or any persons connected with or employed in the factory.

"To officers he proved a most unusual prisoner. He talked freely about some matters, but was evasive about others. Efforts to corner him in every instance proved in vain, though at times it seemed that he was on the verge of complete explanation.

"His whereabouts and movements for the past several weeks are a blank to the officers. While he has seemed to be giving information, when threshed out and connected it has resulted in nothing worth while. Several times he has crossed himself in stories, the officers say, but always has managed to clear up the discrepancies.

### "Evidently a 'Ladies Man.'

"That he is a 'ladies man' is conceded from the numerous letters and photos found among his effects. He had in his grip and trunk perhaps a hundred pictures, the most of them amateur work. They show young men and women on auto rides and picnic parties, individual pictures, couples and in groups. When shown them he merely laughed and made a jocular remark about some girl being 'pretty.'

"Batches of letters and post cards were found. The letters are nearly all from young ladies. Some of them are endearing ones. A few are from young men friends. Many of the letters are signed 'Mary.' None was signed 'Mary Phagan.' The signature of one letter bore the initials 'M. J. P.' This the police thought might have been written by the Phagan girl.

### "$3,200 in Rewards Offered.

"Rewards aggregating $3,200 have been offered for the arrest and conviction of the person who killed 14-year old Mary Phagan.

"The Atlanta Constitution and the Georgian each has offered $1,000 reward.

"At the suggestion of Mayor Woodward, the city of Atlanta has offered a reward of $1,000.

"The state of Georgia, through the Governor, has offered a reward of $200.

"Bowen's detention was continued Tuesday at the suggestion of Chief of Police Beavers of Atlanta, Ga. He wired Chief of Detectives George Peyton as follows:

" 'Hold Bowen and investigate. I am investigating here. Will Rush Information. Keep office advised.'

### "Girl's Undervest is Found Hanging from Window Sill of the Room Bowen Occupied.

"Hanging from the window of room 214, St. Jean Hotel, the room occupied by Bowen, has been found a blood-stained undervest, such as might be worn by a girl. It was of small size as if to suit a girl from 14 to 16 years of age.

"The discovery of the undervest was made Monday morning. A guest of the hotel saw it fluttering from the window and advised an attaché of the place. It was wrapped in a paper and sent to the police station.

"It is believed that an effort was made to throw the vest out of the window and that it caught on the ledge. It was not seen there before Monday morning. Two guests at the hotel declared that it was not there Sunday early in the night.

"The vest has blood stains toward the top of the breast and about half way down at the front. At the back, between the shoulders, a slight trace of blood was also found. The vest is being held in connection with other proper-

ties by the detectives. Bowen has not been advised of the finding of the vest.

"What bearing it has on the case has not yet been developed. Chief Peyton said Tuesday that he would determine it this afternoon, perhaps, as well as some other things that are believed to be worth while—but yet in incubation."

The publication of this article in the Houston Chronicle, owned and published by the Houston Chronicle Publishing Company, in its issue of May 6, 1913, was admitted by defendant, as was also the publication of the picture of the murdered girl, Mary Phagan, and the picture of the plaintiff in the same issue. The circulation of the Houston Chronicle containing the publication amounted to more than 33,000 copies.

[1] Appellant's first assignment of error complains of the action of the court in admitting in evidence, over the objection of defendant, the testimony of the witness George Andrews, who testified as to a conversation between the witness and the witness Peyton with reference to holding plaintiff in custody until the chief of police of Atlanta could be heard from. The assignment cannot be considered for the reason that the statement following it does not show what objection was made to the introduction of this testimony.

[2] We overrule the second assignment of error, which complains of the action of the court in permitting the plaintiff to testify as to what happened at his (the plaintiff's) room, at the time the officers placed him under arrest. The article complained of, and above set out, undertook to describe with great particularity what happened at that time, and it was permissible for plaintiff to show, if he could, the untruth of the publication by testimony as to the actual occurrences at his room when he was arrested.

[3] The third assignment complains that the court erred in permitting the plaintiff and the witness Peyton to testify, over its objection, that plaintiff was not taken before a magistrate after his arrest. The statement following the assignment is substantially as follows:

"While the plaintiff, Bowen, was on direct examination, his counsel asked him the following question: * * * 'Did the officer read any warrant to you that night?' 'No, sir; they did not have any warrant.' Counsel for plaintiff then asked the witness George Peyton: 'Did you have any warrant for his arrest?' Answer: 'No, sir; we did not have any warrant.'"

It is manifest that this statement is insufficient to sustain the assignment complaining, as it does, of the action of the court in permitting the witnesses to testify that plaintiff was not taken before a magistrate.

[4, 5] The publication as a whole was libelous per se, and the court therefore did not err in so instructing the jury and in also instructing them, that the publication and circulation by the defendant being admitted, to return a verdict in favor of plaintiff for actual damages, even though a part of the publication was privileged, which we are not prepared to concede. The fourth assignment, raising the point, is overruled.

[6, 7] The fifth assignment complains of the refusal of the court to give the following special charge requested by appellant:

"The plaintiff having failed to show by a preponderance of the evidence that the defendant in publishing the article complained of was actuated by express malice, you will let your verdict be for the defendant."

The article being libelous per se, the plaintiff was entitled to recover actual damages, and was not required to prove malice except as a basis for the recovery of exemplary damages. This being true, the charge requested was an erroneous statement of the law, for by its terms it denied a recovery of actual damages unless express malice actuating the publication was shown. The charge was also properly refused because it was on the weight of the evidence, in that it assumed that the plaintiff had failed to prove malice by a preponderance of the evidence. The preponderance of the evidence, under the facts of this case, was a question peculiarly within the province of the jury to determine, and not a question of law to be decided by the court. The assignment is overruled.

[8, 9] The sixth assignment complains of the refusal of the court to give the following special charge requested by appellant:

"In order to find exemplary damages against the defendant, the publication charged to have been made by it must have been wanton and malicious. By the term 'malice,' as used herein and in other charges submitted to you by the court, is meant a bad, wicked, or vile intent; the intentional and wicked doing of a wrong hurtful to another. Therefore if you should find that the publication as made, if it was made by the defendant, was libelous, and that it was not privileged, yet if you find from the evidence that the defendant, acting through its officers and agents, was not actuated by malice in making said publication, then as to exemplary damages you will find for defendant."

The charge was correctly refused on two grounds: First, the definition of malice, therein given, was too restricted; and, second, the court's main charge on the issue of exemplary damages was sufficiently full and fair to protect the defendant in all of its rights. In Houston Chronicle Publishing Co. v. McDavid, 173 S. W. 470, in defining the word "malice," it is said:

"A willful or wanton act or gross indifference, as used in the definition of malice, means an act done with the specific intention to injure the person that was injured, or an act done with such utter recklessness as to indicate a disregard of consequences."

The requested charge omits from the definition of malice the matter of gross indifference and of recklessness that would indicate a disregard of consequences, and would deny a recovery except upon proof that the publication was actuated by a bad, wicked, or vile intent, and with the specific intention to injure the plaintiff. The assignment is overruled.

[10] The seventh assignment complains of

the refusal of the court to give the jury the fourth special charge requested by the appellant, which contained the instruction that the publication in a newspaper of a fair, true, and impartial proceeding in a court of justice, or a proceeding in the administration of the law, such as the arrest of a person, is privileged matter under the law, and no action will lie for the publication of such proceedings unless such publication is made from actual malice on the part of the party publishing.

It is asserted by the proposition under the assignment that it being true that plaintiff was arrested and incarcerated, and these facts being matters of public record in the police department of the city of Houston, defendant had the right to publish same, for which plaintiff could have no cause of action except under proof of actual malice.

We think that in refusing to give the charge the court committed no error. It is not pretended that the arrest was made upon a warrant issued therefor by the proper authorities, but the contrary was conclusively shown. When, after his arrest, plaintiff was taken to the police station, the following entries were made in the blotter or police docket there kept for such purpose:

"Time of arrival, Tuesday, May 6, 1913, 1 a. m. Entered P. P. Bowen, white, 22; male. Occupation, clerk. Residence, Newman, Ga. Offense, hold. Arresting officer, Peyton and Hilton. Disposition of case, released by Chief, May 6, 6 p. m."

There was no evidence to show that the ordinances of the city of Houston required the keeping of such a docket, or from which it can be inferred that the entries made therein was a proceeding in a court of justice, or other official proceeding authorized by law in the administration of the law, such as to render as privileged the publication of entries made therein. But even if this is not true, there is nothing contained in the entries to justify the publication that the plaintiff had been arrested and incarcerated for the murder of Mary Phagan, and, this being true, the charge was correctly refused. The assignment is overruled, as well as the eighth, ninth, and tenth, which present substantially the same point.

[11, 12] The eleventh assignment complains that the verdict of the jury awarding exemplary damages was unsupported by the evidence and by a total lack of testimony to show actual malice upon the part of the defendant, its officers and agents.

It may be conceded that there was no ill will, animosity, or hatred entertained by the defendant or its officers toward the plaintiff, and that in that sense there was no express malice shown by the evidence. But in a case of libel it is not required that malice be shown by proof of ill will, animosity, or hatred, nor is it essential to show a willful or wanton act or gross indifference or an act done with the specific intention to injure the person that was injured; but malice may be inferred from the fact that the act complained of was done with such utter recklessness as to indicate a disregard of the consequences. Houston Chronicle Pub. Co. v. McDavid, 173 S. W. 470; Fessinger v. El Paso Times Co., 154 S. W. 1175; Cotulla v. Kerr, 74 Tex. 95, 11 S. W. 1058, 15 Am. St. Rep. 819; King v. Sassaman, 54 S. W. 304.

The facts that gave rise to the publication are that the plaintiff was unjustly suspected by certain police officers of Houston to be guilty of the murder of Mary Phagan in Atlanta, Ga. Acting upon a mere suspicion they took the plaintiff into their custody, without any warrant having been issued for his arrest, and therefore without authority of law (Code Crim. Proc. art. 259), and incarcerated him. It was upon these facts that the article hereinbefore copied was builded. There was no proof to show that the reporter for the newspaper was justified in writing, or the defendant in publishing, the statement that "his moans and weeping at the Hotel St. Jean result in his arrest," or the statement, " 'Why did I do it,' weeps youth in room," or that a "night of terror" led to the detention of Bowen, nor that "Sunday night in room 214, at the St. Jean Hotel, * * * the young man paced the floor and moaned. Persons in adjoining rooms were unable to sleep and reported to the management that something was wrong in the room. An investigation discovered Bowen poring over letters and newspaper accounts of the murder and crying aloud. 'Oh, why, why did I do it,' he is said to have cried. 'I ought not to have done it—I ought not to have done that —if I had it to go over I wouldn't do it,' were repeatedly heard by those who listened and who frequently walked through the hall in an effort to get some cause for the peculiar actions of the man."

It seems that, upon the mere fact of the arrest and incarceration of the plaintiff, an energetic and enterprising reporter of the Chronicle, Higgins by name, evolved from his fertile brain a mass of circumstantial evidence tending to establish that plaintiff had murdered Mary Phagan; and, if the truth of any of the statements was proved on the trial, the appellant has failed to call attention to it in its brief. From aught that appears to the contrary, the damning circumstances as related in the publication were without the semblance of truth, and the defendant published the entire sensational article without question or inquiry as to its truth or falsity, so far as the evidence shows, and with reckless disregard of the consequences. There was an entire absence of probable cause for the publication, and, as shown by the authorities above cited, malice, in such circumstances, may be inferred. We overrule the assignment.

The twelfth assignment complains that the verdict is excessive. We have carefully re-

182 S.W.—5

viewed the evidence in this regard and have concluded that the amount of the award was justified.

No reversible errors appear in the record, and therefore the judgment of the court below is affirmed.

Affirmed.