United States Court of Appeals,

Fifth Circuit.

No. 92-8389.

Edwin De Steiguer SNEAD and Georgetown Railroad Co., Inc., Plaintiffs-Counter-Defendants-Appellants, Cross-Appellees,

v.

REDLAND AGGREGATES LTD. and Standard Railway Wagon Co., Ltd., Defendants-Counter-Claimants-Appellees, Cross-Appellants.

Aug. 27, 1993.

Appeals from the United States District Court for the Western District of Texas.

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I.

A.

Edwin de Steiguer Snead, a plaintiff, is the chairman of Georgetown Railroad Co. ("Georgetown"), another plaintiff. In 1984, Snead and his brother Bill[1] began designing and building a new type of railroad car that they called a "dump train," which consists of a group of open-topped railroad hopper cars joined together and to a transfer car. A conveyer belt runs under each hopper car to the transfer car. Because each hopper car has sloping side walls and gates in the bottom, bulk material can be discharged easily from the cars onto the conveyer belt, which then carries the material to the transfer car; the transfer car unloads material onto either side of the tracks. The advantage of using a dump train instead of other commercially-used train cars is that material can be unloaded without additional equipment or special facilities at the unloading site.

In 1985, Snead filed a patent application on the dump train invention; the Patent Office rejected Snead's application because a German patent application filed ten years earlier had disclosed a similar invention. Snead then pursued and obtained patents on several elements of the dump train

---

[1]Bill Snead is not a party to this appeal, and all references herein are to Ned Snead unless otherwise noted.

but not on the general concept.

Snead completed the dump train in 1985 and began promoting it publicly; Georgetown also used the dump train commercially in Texas. In 1986, Snead gave a presentation on the dump train in Chattanooga, Tennessee, after which personnel from defendant Redland Aggregates, Ltd. ("Redland"), approached Snead and expressed interest in developing such a train for the European market. Redland is an English company that quarries sand, gravel, and crushed stone.

In November, 1986, Snead met in England with Redland and a representative from defendant Standard Wagon ("Standard"), Redland's preferred train supplier. Snead explained the dump train and provided the companies with a brochure stating that a patent was pending, a videotape, and photographs of the dump train. Snead also answered technical questions and described mechanical and structural details. The parties discussed a royalty and set up a meeting in Texas to view the dump train in operation. On November 14, 1986, the parties met at Georgetown's facilities.

On November 26, the parties again met at the Georgetown facilities. Plaintiffs demonstrated the operation of the dump train and disclosed more of the technical advantages and construction of the trains. That evening, Snead invited representatives from Standard and Redland to spend the night at his lakehouse. The representatives inquired about the dump train patents, and Snead stated that the patents existed but were his personal property and that he would not discuss them.

The following day, Snead presented the Redland and Standard representatives with a licensing agreement covering the dump train. Although Snead previously had not mentioned anything about confidentiality, he expected the representatives to sign the agreement. The representatives refused to do so without authorization from England and said they would not sign until the patent question was resolved. Snead became angry and told them that they were "sure as hell going to sign something" before leaving.

Snead later returned with a "Non-Disclosure Agreement." Again, the representatives would not agree to the terms of the agreement. Snead again became angry and left the room, returning with a third document entitled "Non-Disclosure Agreement," which the representatives finally agreed to sign.

Under the Non-Disclosure Agreement, Georgetown promised to give Redland and Standard information about the dump train to allow them to study the feasibility of use in the United Kingdom. In return, Redland and Standard agreed to keep confidential any information provided by Georgetown and to provide Georgetown with copies of all information generated in connection with the feasibility study. After this agreement was signed, Georgetown sent Standard a set of drawings of the dump train.

Standard had to consult British Rail regarding the feasibility of using the dump train in England. British Rail determined that such use was not feasible, so Redland and Standard decided to design and build a train suitable for British Rail. Because Redland and Standard still believed that Snead had patent protection, licensing discussions continued.

After consulting with its attorneys, Standard decided that it would design around Georgetown's United Kingdom patent application and would make no further use of the drawings and data supplied by Georgetown. Standard informed Georgetown of the method by which it would design around the patent. Standard then completed and sold its version of the dump train.

B.

On February 1, 1988, Snead and Georgetown filed suit against Redland and Standard for misappropriation of trade secrets and breach of a confidential relationship. On February 5, 1988, Snead issued a press release, regarding the suit, that accuses Standard and Redland of "international theft," "industrial espionage," and "international piracy." Redland and Standard counterclaimed for libel.

After a bench trial, the district court rendered judgment in favor of Redland and Standard on Snead and Georgetown's claims and on the counterclaims. The district court held that Snead and Georgetown had no trade secret rights in their dump train and that no confidential relationship ever existed. Because Snead never had patent protection for the dump train concept, the confidentiality agreement was void, as Snead had procured it fraudulently. On the libel counterclaim, the judge found Snead and Georgetown guilty of libel *per se* and held that Snead had acted with actual malice in issuing the press release. The court awarded Redland and Standard $1 each in compensatory

damages and $500,000 each in punitive damages.

Snead and Georgetown moved for rehearing and for a new trial on the libel counterclaim. The district court denied the motion for new trial and clarified its original findings with another opinion.

II.

Snead[2] claims that the award of punitive damages was erroneous.[3] Before addressing those arguments, we first must address the issue of whether Redland and Standard are public or private figures and whether the relevant speech involved a matter of public or private concern. Only after making these findings can we properly analyze various issues raised on appeal, as the status of the libel plaintiff and the alleged libelous speech determines the minimum constitutionally-required standard of fault.

The district court did not make any findings on these issues. Because both inquiries are issues of law and the record is fully developed, however, we may address them without remanding.[4]

A.

First, we must decide whether Redland and Standard are public or private figures.[5] As one court observed in a much-quoted passage, trying to decide whether a particular plaintiff is a public or private figure "is much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enters.,* 411

---

[2]We use Snead's name to refer to the arguments raised by both Snead and Georgetown.

[3]We reject Snead's argument that the libel counterclaim was for product disparagement. Although Redland and Standard may have referred to their claim as being one for trade libel, their pleadings consistently cite the Texas libel statute as the basis for their claims and use the terms libel and defamation. We similarly reject Snead's argument that a corporation may not sustain a cause of action under Texas law for libel. The Texas Supreme Court has held that corporations, as opposed to businesses, may bring a cause of action for libel. *Brown v. Petrolite,* 965 F.2d 38, 43 n. 5 (5th Cir.1992); *General Motors Acceptance Corp. v. Howard,* 487 S.W.2d 708, 712 (Tex.1972).

[4]*See Rebozo v. Washington Post Co.,* 637 F.2d 375, 379 (5th Cir. Feb.1981) (public figure issue is a question of law for the trial court to decide); *Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 761-63, 105 S.Ct. 2939, 2946-47, 86 L.Ed.2d 593 (1985) (plurality opinion) (deciding public concern issue where lower courts had not ruled on the issue.).

[5]Redland and Standard argue that Snead has waived any claim that the actual malice rule applies because he did not raise the First Amendment as an affirmative defense. We disagree. The First Amendment imposes on libel plaintiffs the burden of proving that the defendant's conduct satisfies a certain standard of fault; it does not create an affirmative defense that must be pled.

F.Supp. 440, 443 (S.D.Ga.1976), *aff'd,* 580 F.2d 859 (5th Cir.1978). The inquiry becomes even more difficult when the libel plaintiff is a corporation, as our prior cases do not establish a method for determining whether a corporation is a public or private figure. *See Golden Bear Distrib. Sys. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.1983) (finding that a corporation was a private figure without developing a test for that inquiry).

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344-45, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), the Court gave two policy justifications for differentiating between public and private figures. First, public figures "enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." *Id.* at 344, 94 S.Ct. at 3009. Second, public figures normally have thrust themselves into the public eye, inviting closer scrutiny than might otherwise be the case. In other words, public figures "invite attention and comment." *Id.* at 344-45, 94 S.Ct. at 3009.

These justifications for the public/private dichotomy do not suggest a general rule to be applied to corporations.[6] As to the first criteria, corporations do not necessarily have greater access to the channels of effective communication than do individuals. Some corporations, such as media corporations or large conglomerates, obviously have such access, but the bulk of corporations do not. Similarly, the second criteria does not suggest a generalization for corporations. Although some corporations voluntarily thrust themselves into the public eye, the majority of corporations do not.

Because the two *Gertz* justifications for the public figure/private figure dichotomy do not suggest a general rule to be applied to corporations, the inquiry must be made on a case-by-case basis, examining all the relevant facts and circumstances. We suggest several factors here but we do not suggest that these are the only factors to consider.

First, the notoriety of the corporation to the average individual in the relevant geographical

---

[6]*But see* Patricia Fetzer, *The Corporate Defamation Plaintiff as First Amendment "Public Figure": Nailing the Jellyfish,* 68 IOWA L.REV. 35, 49-86 (1982) (arguing that corporations should be more susceptible to public figure status than are individuals).

area is relevant. Notoriety will be affected by many factors, such as the size and nationality of the corporation. Here, we safely can assume that the majority of Americans has never heard of Redland or Standard. Although they are not small corporations, they are alien corporations that apparently have no United States subsidiaries.

Second, the nature of the corporation's business must be considered. Redland mines stone, and Standard builds railroad cars. Corporations in these businesses do not ordinarily become household names. Prominent consumer goods makers or merchants, as well as consumer service corporations, are much more likely to attain public figure status.

Third, courts should consider the frequency and intensity of media scrutiny that a corporation normally receives. For example, even a small corporation that does not deal with consumers might attain notoriety if it engages in frequent corporate takeovers that become widely publicized. In this case, the record contains no evidence that Redland or Standard have received significant past publicity.[7] On the basis of these factors, we conclude that Redland and Standard should be deemed private figures.

## B.

Next, we must consider whether the speech involves a matter of public or private concern. In making this inquiry, we must consider the form, content, and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690-91, 75 L.Ed.2d 708 (1983); *Dun & Bradstreet,* 472 U.S. at 761, 105 S.Ct. at 2946.

As to the form of the speech, Snead argues that because the defamatory material was contained in a press release, it was a matter of public concern. Although the fact that the material was in a press release has some relevance, that relevance is diminished when the press release is unsolicited and not in response to previous media coverage of an issue. A speaker cannot turn his

---

[7]The record does reveal that the press release that is the subject of this suit was reprinted in several industry publications. Although some individuals may be considered public figures in a small geographical community, we decline to extend such reasoning to an *industry.* After all, almost every individual or corporation is well known among some small group of people. As we read *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a public figure must be known to the public at large, not merely to a select group of individuals similarly situated to the individual or corporation in question.

speech into a matter of public concern simply by issuing a press release.

Next, we consider the content of the speech. Snead makes three arguments as to why the content of the speech raises a matter of public concern. First, he argues that the press release concerns a lawsuit and that lawsuits are a matter of public concern. Second, he contends that the allegations in the lawsuit regard industrial espionage and international competition, subjects widely discussed in the media. Third, Snead contends that his comments concerned matters of special interest to the railroad and construction industry.

To support his first argument, Snead cites *Time, Inc. v. Firestone,* 424 U.S. 448, 456-57, 96 S.Ct. 958, 966-67, 47 L.Ed.2d 154 (1976), for the proposition that lawsuits are matters of public concern. To the contrary, the Court recognized that individuals do not "forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom." *Id.* at 457, 96 S.Ct. at 966-67. Similarly, here, Redland and Standard were drawn into this controversy against their will.

Snead's second argument, on the other hand, is relevant to the issue. He argues that international competition and industrial espionage are matters of public concern. Although Snead may be correct that the public is concerned about these issues, his speech does not concern an ongoing public debate about international competition and industrial espionage. The press release was not aimed at enlightening the general public; it "was speech solely in the individual interest of the speaker and its specific business audience." *Dun & Bradstreet,* 472 U.S. at 762, 105 S.Ct. at 2947. Although an intellectual property dispute might rise to a matter of public concern if it concerns a product of extreme importance (e.g., a miracle drug), ordinarily such disputes between two parties will be matters of private concern.

Snead's third argument aids Redland and Standard. Even if the record proves that this dispute was of particular interest to the railroad and construction industries, it does not mean it was a matter of interest to the general public. The fact that the press release was reported primarily in industry publications indicates that the speech was not a matter of public concern but rather a matter of private concern of interest only to a particular industry.

Finally, we consider the context of the speech. The press release was an unsolicited comment on a lawsuit between private parties, not issued in response to any existing matter of public concern. In such a context, we can only conclude that the speech was of private concern. Overall, the three relevant factors strongly support the conclusion that the speech at issue was a matter of private concern.

## III.

Snead argues that the award of punitive damages must be vacated because (1) he did not speak with actual malice, (2) the trial court did not award actual damages, and (3) the award is unconstitutional. Redland and Standard cross-appeal the damages determination, arguing that the district court (1) should have awarded presumed damages and (2) should have awarded more actual damages.

## A.

Redland and Standard argue that the district court should have awarded more actual damages. In its original opinion, the district court stated the following:

> While the Court finds Defendants were damaged by the press release and its media coverage, it does not find from the evidence any specific actual damages. In cases involving libel per se, however, actual damages are presumed and a party may recover exemplary damages even though they [*sic*] did not suffer any actual damages.

It appears, from this, that the court initially held that Redland and Standard had not proved any actual damages, but the court assumed that it could award exemplary damages, even in the absence of actual damages.

On motion for rehearing, Snead argued that the court could not award punitive damages without a finding of actual damages. In response, the court stated as follows:

> In its opinion, the Court expressly found, by a preponderance of the evidence, each of the Defendants sustained substantial actual damages as a result of Ned Snead's conduct, individually and on behalf of the Georgetown Railroad Company, Inc.... The exact actual damages sustained by either Defendant, under the circumstances of this case, would be impossible to establish by competent evidence. The Court awarded each Defendant $1.00 in actual damages, but could easily have awarded substantially more. While the Court declined to be persuaded by Defendants' evidence that the actions of Ned Snead caused an irreversible loss in the value of Redland's stock or a 50 percent reduction in value of the good will of Standard, this did not mean there were not substantial actual damages, and actual damages in six figures for each Defendant could well have been awarded with additional punitive damages.

We read these two passages as a holding that Redland and Standard could not *prove* any actual damages. When the court refers to the possibility of awarding actual damages in six figures, we think it was referring to the possibility of awarding *presumed* damages. This is the only fair reading of the passage, as the court said it would be impossible to establish actual damages.

We affirm the district court's finding that Redland and Standard suffered no quantifiable actual damages.[8] The district court correctly held that Redland and Standard cannot point to evidence in the record sufficient to establish any actual damages with the required specificity.

### B.

Redland and Standard argue that the district court should have awarded presumed damages. Under Texas law, presumed damages are available in cases of libel *per se*. *Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984). Because damage to a person's reputation is difficult to quantify, the law allows the factfinder to presume damages to compensate for that damage. Even if the factfinder finds that the plaintiff's reputation was damaged, however, it may choose not to award presumed damages. *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 488 (Tex.App.—Corpus Christi 1989, writ denied).

The excerpted portions from the district court's opinions quoted above indicate that the court may have misunderstood Texas law regarding presumed damages. In the first excerpted passage, the court states that in a case of libel *per se,* the law will presume damages, allowing a party to recover exemplary damages even without a showing of actual damages.

As we explain in part III.C, *infra,* this view of Texas law is partially incorrect. We find no other significant references to presumed damages in either of the district court's opinions. In the second excerpted passage quoted above, the court refers to the potential of awarding significantly greater actual damages. In part III.A, *supra,* we noted that the court probably was referring to presumed damages when it used the term "actual damages" in this passage.

---

[8]Because Redland and Standard have not proved that they are entitled to actual damages, we need not decide whether the First Amendment requires a libel plaintiff to prove that a defendant breached a certain standard of care in order to recover actual damages in a case involving a private figure and a matter of private concern. We leave that issue for another day.

We find these passages somewhat ambiguous on the issue of presumed damages. The district court never explicitly stated that it was not awarding Redland and Standard presumed damages. Under Texas law, as we observed, the district court is allowed to find that Snead committed a libel *per se,* yet choose to award no presumed damages. It is possible that the district court elected not to award such damages. On the other hand, the district court may have believed, erroneously, that under Texas law, presumed damages are merely a legal fiction used to justify awarding punitive damages when no actual damages can be proven.

At the least, the district court's opinion raises sufficient ambiguity to justify a remand to consider whether it wishes to award presumed damages. The district court's decision on the presumed damages issue necessarily will affect the availability of punitive damages, as we explain in part III.C. Because Snead does not dispute that the speech in question was libel *per se,* the district court need only decide whether it wishes to award presumed damages and whether such an award would be constitutional.

The parties dispute what constitutional standard of care is required in this case. Because we have concluded above that this case involves a private figure and a matter of private concern (a "private/private case"), we now decide the *res nova* question of what standard of care, if any, is required by the First Amendment in a private/private case. This will guide the district court on remand and avoid the possibility of a second remand.

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), the Court held that the First Amendment prohibits awards of presumed and punitive damages unless the plaintiff can prove that the statements were made with actual malice.[9] To recover actual

---

[9]The term "actual malice" is somewhat misleading, as it is a term of art crafted in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that has nothing to do with "malice" as the term ordinarily is used. For a statement to be made with "actual malice," it must be made with knowledge that it is false or with reckless disregard for its falsity. *Id.* at 279-80, 84 S.Ct. at 725-26.

"Actual malice" must be distinguished from "common law malice." To prove that the defendant acted with "common law malice," the plaintiff must show that the defendant acted out of spite, ill will, or vengeance. Many states require a showing of "common law malice" as an additional requirement for recovery of punitive damages. RODNEY A. SNOLLA, LAW OR DEFAMATION § 9.08[3][b], at 9-19 (1992).

damages, the plaintiff need not prove actual malice, but under the First Amendment, states cannot impose liability without fault. *Id.* at 347, 94 S.Ct. at 3010-11. *Gertz* was the Court's first extension of the actual malice rule to *private* figures. Prior to *Gertz,* the Court had held that the First Amendment prohibits *public* officials and *public* figures from recovering damages (actual, presumed or punitive) for libel unless the statements were made with actual malice. *Gertz,* 418 U.S. at 334-336, 94 S.Ct. at 3004-05 (citing *Sullivan,* 376 U.S. at 279-80, 84 S.Ct. at 725-26 (public officials), and *Curtis,* 388 U.S. at 162, 87 S.Ct. at 1995 (public figures)).

In *Dun & Bradstreet,* the Court added yet another dichotomy to Constitutional libel law.[10] After *Dun & Bradstreet,* the constitutional fault standards defined in *Gertz* for private figures apply only to cases involving speech on an issue of public concern.[11] Five Justices agreed that in private/private cases, the plaintiff is not constitutionally required to prove actual malice to recover presumed or punitive damages. 472 U.S. at 760-61, 105 S.Ct. at 2946 (plurality); 472 U.S. at 763-64, 105 S.Ct. at 2947-48 (Burger, C.J., concurring); 472 U.S. at 773-74, 105 S.Ct. at 2953 (White, J., concurring). Unfortunately, the Court did not provide any guidance as to how to determine whether speech relates to an issue of public rather than private concern. While the Court did hold

Prior to *Sullivan,* Texas law required such a showing. *Leyendecker,* 683 S.W.2d at 375 (quoting *Houston Chronicle Publishing Co. v. Bowen,* 182 S.W. 61, 65 (Tex.Civ.App.—Galveston 1915, writ ref'd)). Under Texas law, however, malice could be inferred "from the fact that the act complained of was done with such utter recklessness as to indicate a disregard of the consequences." *Id.* Where malice was inferred, it was known as "implied malice."

Texas law thus required a showing of "common law malice," but the plaintiff could make that showing by proving either "implied malice" or "express malice." *Fessinger v. El Paso Times Co.,* 154 S.W. 1171, 1175 (Tex.Civ.App.—El Paso 1913, writ ref'd). The term "express malice" referred simply to the traditional meaning of "common law malice"—personal ill will or animosity. *Id.*

[10]The *Dun & Bradstreet* Court apparently rejected another suggested dichotomy. At least five Justices eschewed the suggestion that the status of the defendant as a member or nonmember of the media should affect the standard of fault. 472 U.S. at 773, 105 S.Ct. at 2952-53 (White, J., concurring); 472 U.S. at 783-84, 105 S.Ct. at 2958 (Brennan, Marshall, Blackmun and Stevens, JJ., dissenting; Blackmun, J.; and Stevens, J.). Because the Court rejected that dichotomy, we do not consider significant the fact that Snead is not a media defendant.

[11]The effect of *Dun & Bradstreet* on the constitutional standards of fault that apply in cases involving *public* officials or figures and matters of *private* concern is uncertain. SHOLLA, *supra* note 9, § 3.04.

that plaintiffs in a private/private case need not demonstrate actual malice, it failed to explain whether the Constitution imposes a minimum standard of fault.

"Under the First Amendment, there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz,* 418 U.S. at 339-40, 94 S.Ct. at 3006-07. Even harmful speech receives protection under the First Amendment.

On the other hand, "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open' debate on public issues." *Id.* at 340, 94 S.Ct. at 3007 (citation omitted). "They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* (citation omitted). False statements of fact are "not worthy of constitutional protection." *Id.*

The First Amendment's role in establishing standards of fault, then, has nothing to do with constitutional protection for the libel itself. Rather, the Court has recognized that punishment of libel runs the risk of chilling the exercise of the rights of free speech and press. *Id.* On the other hand, the Court also has acknowledged that states have a significant interest in protecting the reputation of individuals by compensating them for harm inflicted by defamatory falsehoods. *Id.* at 341, 94 S.Ct. at 3007-08. Because these two values are in tension, the past thirty years of constitutional libel jurisprudence have involved a "continuing effort to define the proper accommodation between these competing concerns...." *Id.* at 342, 94 S.Ct. at 3008.

Although speech on matters of private concern is of less constitutional value than is speech on matters of public concern, *Connick v. Myers,* 461 U.S. 138, 146-47, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983), such speech is not totally unprotected by the First Amendment. *Id.* at 147, 103 S.Ct. at 1690 (cited in *Dun & Bradstreet,* 472 U.S. at 760, 105 S.Ct. at 2946 (plurality opinion)). Our conclusion today should not be construed to diminish that constitutional protection. Just as the Court has done in a line of cases after *Sullivan,* we must determine the proper balance between the

protected speech at issue and the states' interest in protecting the reputation of private individuals.

In *Dun & Bradstreet,* the Court indicated that states should be allowed to return to their own common law rules in private/private cases. Justices Burger and White stated that they would hold that the Constitution imposes no minimum standard of fault where the case involves a private figure. 472 U.S. at 763-74, 105 S.Ct. at 2947-48 (Burger, C.J., concurring); 472 U.S. at 772, 105 S.Ct. at 2952 (White, J., concurring). Although Justice Powell's opinion for a three-Justice plurality appears to adhere to the *Gertz* holding where issues of public concern are involved, his opinion contains strong hints that the plurality intended for the holding in *Dun & Bradstreet* to allow states to return to common law rules in private/private cases. *See* SMOLLA, *supra* note 9, § 3.02[5].

First, and most importantly, the Court states the following:

> The dissent, purporting to apply the same balancing test that we do today, concludes that even speech on purely private matters is entitled to the protections of *Gertz....* The dissent's "balance," moreover, would lead to the protection of all libels—no matter how attenuated their constitutional interest.... The dissent would, in effect, constitutionalize the entire common law of libel.

472 U.S. at 761 n. 7, 105 S.Ct. at 2946 n. 7. Because the plurality expressed its distaste for constitutionalizing the entire common law of libel, it appears to have left the law up to the states in private/private cases.

Second, the plurality cited with approval the leading state court decision that held that the *Gertz* constitutional standards do not apply in cases of purely private defamation. 472 U.S. at 760, 105 S.Ct. at 2946 (citing *Harley-Davidson Motorsports v. Markley,* 279 Or. 361, 568 P.2d 1359, 1364 (1977)). The reasoning in *Markley,* 568 P.2d at 1364, is consistent with our conclusion that the lower First Amendment interest in private/private cases is outweighed by the states' interest in protecting reputation.

Based upon our reading of Justice Powell's plurality opinion, we believe that five Justices of the *Dun & Bradstreet* Court supported common law standards for private/private cases. We therefore conclude that the Constitution imposes no minimum standard of fault in private/private libel cases.

Under Texas law, presumed damages are available in cases of libel *per se* without any

showing of fault on the part of the defendant. *E.g., Jenkins v. Taylor,* 4 S.W.2d 656, 661 (Tex.Civ.App.—Austin 1928, no writ) (presumed damages available in case of libel *per se* as a matter of law); *see also* 28 TEXAS JUR.3d, *Damages* § 111 (1983). Because neither the Constitution nor Texas law imposes any fault requirement for the recovery of presumed damages in private/private cases of libel *per se,* the district court need only determine on remand whether it wishes to award such damages.

C.

Next, we consider the award of punitive damages. Snead argues that the award must be vacated because (1) he did not speak with actual malice, (2) the trial court did not award actual damages, and (3) the award is unconstitutional. We first address Snead's second argument, as the resolution of this issue will affect our treatment of the other two.

Snead asserts that the district court erred in awarding punitive damages because it awarded nominal rather than actual damages. We agree. As we recently explained, under Texas law, the plaintiff is foreclosed from recovering punitive damages unless the factfinder has awarded actual damages. *Brown v. Petrolite Corp.,* 965 F.2d 38, 48-49 (5th Cir.1992) (citing *Doubleday & Co. v. Rogers,* 674 S.W.2d 751, 754 (Tex.1984)).[12] Where the court awards only nominal damages, no punitive damages may be given. *Id.* at 49.

Redland and Standard try to avoid the application of this rule by arguing that the $1 awarded to each defendant on the counterclaim constitutes actual damages rather than nominal damages. We disagree. An award of $1 in compensatory damages will almost always be considered nominal damages. *See Petrolite,* 965 F.2d at 38 (treating a compensatory award of $1 as nominal damages).[13]

---

[12]In *Petrolite,* we also stated that in a private/private case, a plaintiff, under constitutional and Texas law, must prove actual malice to recover punitive damages. 965 F.2d at 46 (citing *Gertz,* 418 U.S. at 350, 94 S.Ct. at 3012; *Golden Bear Distrib. Sys. v. Chase Revel, Inc.,* 708 F.2d 944, 947 (5th Cir.1983); *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 84-85 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.)). The statement regarding actual malice is plainly inconsistent with *Dun & Bradstreet,* but it is *dictum,* which does not bind us. *See Hensgens v. Deere & Co.,* 833 F.2d 1179, 1182 n. 1 (5th Cir.1987), *cert. denied,* 493 U.S. 851, 110 S.Ct. 150, 107 L.Ed.2d 108 (1989).

[13]In a rare case, $1 might be the amount of actual damages suffered. However, to deem an award of $1 actual, rather than nominal, the award of $1 must be supported by competent

Although the district court's opinion indicates that Redland and Standard suffered damage to their reputation, the $1 awarded here was for nominal damages. Because, as we noted above, the record contains no evidence that Redland and Standard suffered any actual damages, we conclude that the district court only awarded nominal damages. Consequently, we vacate the award of punitive damages.

We need not address Snead's claim that the punitive damage award is unconstitutional because of its disproportion to the actual damage award. Because we concluded in part III.B, *supra,* that the Constitution imposes no minimum standard of fault for the recovery of presumed or punitive damages in private/private cases, we vacate the district court's finding of actual malice, as it now is irrelevant to this case.

Although the Constitution imposes no standard of fault in private/private cases, Texas law requires the defendant to act with common law malice to justify a punitive damage award. *Leyendecker,* 683 S.W.2d at 375.[14] Because the district court held that Snead acted with common law malice and Snead did not appeal that finding, the availability of punitive damages on remand depends only upon whether the district court chooses to award presumed damages.

To guide the district court on remand, we also resolve a dispute over the availability of punitive damages where the plaintiff recovers only presumed damages. Under Texas law, an award of presumed damages can support an award of punitive damages.[15] In *Leyendecker,* 683 S.W.2d at 372-75, the court upheld an award of presumed damages in a case of libel *per se* and affirmed a punitive damage award in spite of the fact that the plaintiff had not proven any actual damages.

Citing *Doubleday,* Snead argues that presumed damages will not support an award of punitive

---

evidence that proves that $1 in actual damages was all the damage that the plaintiff suffered.

[14]As we have discussed, *see supra* note 9, the plaintiff can prove common law malice under Texas law either by showing ill will (express malice) or utter recklessness (implied malice). In this case, the district court found that Snead's press release was motivated by ill will—a "malicious intent to damage and halt the business operations of Defendants...." This plainly constitutes a finding of express malice. Because Redland and Standard proved express malice, they have met the requirement of proving common law malice.

[15]Of course, the presumed damages must exceed a nominal amount to justify punitive damages.

damages where no actual damages have been proven.  Even if *Doubleday* so held, *Leyendecker* implicitly overruled it.  We also find *Doubleday* distinguishable.  There, the jury awarded *zero* actual damages and $200,000 in punitive damages.  Where no actual damages or presumed damages are awarded, the general Texas rule applies that no punitive damages are recoverable.  If presumed damages are awarded, they act as a substitute for actual damages, and punitive damages are recoverable under *Leyendecker.*  In summary, the cases are distinguishable because the jury awarded presumed damages in *Leyendecker* but did not award any compensatory damages in *Doubleday.*

The judgment is AFFIRMED in part, VACATED in part, and REMANDED.

Circuit Judge DUHÉ concurs in the result.